JUDGE SCHEINDLIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



M.G. and V.M. on behalf of themselves individually
and their child, Y.T.

          Plaintiffs,

  -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION; NEW YORK CITY BOARD OF
EDUCATION; DENNIS WALCOTT, in his official
capacity as Chancellor of the New York City School
District,

          Defendants.

Civ. No.
COMPLAINT

RECEIVED
JUL 0 3 2013
U.S.D.C. S.D. N.Y.
CASHIERS

## PRELIMINARY STATEMENT

1. This case is being brought on behalf of M.G. and V.M. ("Plaintiffs" or "Parents") and their son, Y.T., an eleven year old severely autistic child, pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1415, *et. seq.*; the due process clause of the 14th Amendment of the U.S. Constitution; 42 U.S.C. § 1983; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"); the New York State Constitution, New York State Education Law §§ 3202, 3203, §§ 4401 *et. seq.*, and the regulations promulgated thereunder.

2. Defendants have classified Y.T. as autistic under the IDEA.

3. Since 2008, Y.T. has attended Defendants' 6:1:1 program for children with autism at P.S. 255@307 ("P.S. 255") in District 75.

4. District 75 is a separate citywide district for children with severe disabilities that offers classes in four ratios for specific disability classifications. The 6:1:1 class is for children on the autism spectrum.

5. The majority of children who are classified as autistic are placed in Defendants' 6:1:1 program. The 6:1:1 class is the smallest instructional ratio Defendants have to offer an autistic child, regardless of need.

6.  The Plaintiffs' native language is Arabic. They are not fluent in reading, speaking or understanding the English language, although they possess some basic skills. They understand and speak Arabic with 100% fluency.

7.  For the 2008-2009, 2009-2010, 2010-2011, 2011-2012, 2012-2013 and 2013-2014 school years, the Defendants have: (a) failed to timely, thoroughly, and appropriately assess Y.T. and his special education needs; (b) failed to develop substantively and procedurally valid Individualized Education Programs ("IEPs") for Y.T.; (c) failed to provide timely and appropriate educational placements to Y.T.; (d) failed to employ appropriate evaluation, IEP development, and placement procedures with regard to Y.T.; (e) denied the Parents due process; (f) failed to provide Y.T. with a Free Appropriate Public Education ("FAPE"); and (g) excluded the Parents from the special education process by failing to provide legally sufficient language access services.

8.  For the 2008-2009, 2009-2010, 2010-2011, 2011-2012, 2012-2013 and 2013-2014 school years, Defendants have failed to offer or provide bilingual Arabic-English special education services in violation of their legal obligation to so pursuant to the IDEA and New York State law.  During the earlier years, Y.T. only understood Arabic.

9.  For the 2008-2009, 2009-2010, 2010-2011, 2011-2012 school years, Defendants never provided any educational records or notices to Plaintiffs that were translated into Arabic and provided an interpreter at only one meeting in 2008. Further, Defendants failed to provide IDEA-mandated notices and safeguards to the Plaintiffs in any language for those years.

10. For the 2012-2013 and 2013-2014 school years, Defendants failed to provide legally sufficient notices and safeguards and provided only limited education-related documents translated into Arabic.

11. Defendants' failure to provide translation and interpretation services ("Language Access") is part of Defendants' system-wide failure to afford Arabic-speaking parents of disabled children language access and due process rights.

12. During the 2008-2009, 2009-2010, 2010-2011, 2011-2012, 2012-2013 and 2013-2014 school years, Defendants adopted and implemented illegal and systemic blanket policies and practices with

respect to the delivery of special education services to children with autism, which were applied to the entire evaluation, IEP and placement process for Y.T.

13. Further, Defendants failed to adopt and promulgate policies to ensure substantive and procedural compliance with the IDEA, state law and state policies and failed to train, supervise, and monitor their staff to ensure compliance.

14. During the 2008-2009, 2009-2010, 2010-2011, 2011-2012, 2012-2013 and 2013-2014 school years, Defendants discriminated against Y.T based upon his disability and failed to afford him reasonable accommodations. Defendants' behavior was knowing, gross, and reckless.

15. Defendants violated Y.T.'s rights under the New York and United States Constitutions with respect to the denial of, limitation on, and exclusion with respect to Y.T.'s state-mandated rights to general and special education based upon his disability and violated his right to education without due process of law.

16. A Due Process Complaint ("DPC") raising claims concerning the 2008-2009, 2009-2010, 2010-2011, 2011-2012 school years was filed with the Defendants' Impartial Hearing Office in February 2012 and amended in June 2012.

17. The impartial hearing officer ("IHO") appointed to hear the case issued three interim decisions in the 2011-2012 school year and a final decision in February 2013 ("IH Decision"). An appeal and cross-appeal of portions of the IH Decision is currently pending before the State Review Officer ("SRO") of the New York State Education Department ("NYSED"). Both parties have not yet completed the process of filing all of their papers relevant to the appeal.

18. Y.T. has been receiving individual (1:1) Applied Behavioral Analysis ("ABA") services on an after school basis ("1:1 ABA services") funded by Defendants since the summer of 2012. Those services were ordered by the IHO through her second and third interim orders and as part of the IH Decision.

19. Defendants failed to appeal or seek a stay of the interim orders and, instead, complied with them.

20. Since October 2009, Defendants have offered the exact same program and services to Y.T.: the 6:1:1 class with a paraprofessional in District 75.

21. The 6:1:1 class (with or without a paraprofessional) in District 75 is the only placement/program option in a public school setting for children with severe autism available to Defendants' IEP team.

22. Students requiring 1:1 instruction, ABA services, home-based services and other individualized modifications must seek those services through impartial hearings. Defendants IEP teams cannot offer the services. They are constrained by what is available on Defendants' limited menu of services.

23. Defendants offered basically the same IEP and educational placement for the 2012-2013 and 2013-2014 school years: a 6:1:1 class with a paraprofessional in District 75. The 2013-2014 school year started as of July 1, 2013 and July 3, 2013 is the first day of the summer school session for special education students who, like Y.T., receive 12-month extended school year services.

24. Defendants have refused to provide 1:1 instruction, ABA , home-based services, additional speech and language therapy, toilet training, assistive technology (an augmentative communication device), and other services that Y.T. requires to have an opportunity for educational progress and to gain equal benefit to education. These were some of the services that Plaintiffs attempted to obtain through the hearing pending before the SRO.

25. Further, On June 21, 2013, Defendants' counsel informed Plaintiffs' counsel that they will terminate Y.T.'s 1:1 ABA services on June 30, 2013, the end of the 2012-2013 school year. Further, have refused to Defendants will not modify Y.T.'s IEP to make any changes to Y.T.'s IEP or educational placement.

26. Plaintiffs require emergency relief to enjoin the termination of the 1:1 ABA Services and to obtain the additional relief that they seek. Without such intervention, Y.T. will suffer irreparable harm.

27. For various other reasons alleged herein, including the fact that an emergency exists, exhaustion is futile, Plaintiffs raise systemic claims and also allege deficiencies in the structure of the administrative proceedings, further exhaustion of all of Plaintiffs' claims is not required.

PARTIES

28. Plaintiff, Y.T., is a child with a disability pursuant to the IDEA and an individual with a disability under Section 504.

29. The Plaintiffs, M.G. and V.M., live together with Y.T. in Queens, New York.

30. Initials are used throughout this Complaint to preserve the confidentiality of sensitive medical, educational, and disability-related information under the IDEA and the Family Educational Rights and Privacy Act of 1974 (FERPA).

31. Defendant, DENNIS WALCOTT, is the Chancellor of the New York City School District ("the Chancellor") and as such is entrusted with the specific powers and duties set forth in N.Y. EDUC. LAW § 2590-h.

32. Defendant, THE NEW YORK CITY BOARD OF EDUCATION ("the Board of Education" or "the Board"), was or continues to be the official body charged with the responsibility of developing policies with respect to the administration and operation of the public schools in the City of New York. It is a recipient of federal financial assistance.

33. Upon information and belief, Defendant, THE NEW YORK CITY DEPARTMENT OF EDUCATION ("Department" or "DOE"), claims to be and appears to have been delegated by the Chancellor the responsibility of developing policies with respect to the administration and operation of the public schools in the City of New York, including programs and services for students with disabilities. It is not clear that the DOE is a legally formed independent entity, although it appears in lawsuits and claims to be a "municipal" corporation. It is a recipient of federal financial assistance.

34. Defendants individually and/or together form the Local Educational Agency for the purposes of providing a FAPE under the IDEA to disabled children in New York City. They are also individually and/or jointly responsible for delivering educational services to children in New York City under New York State Education law.

5

## JURISDICTION & VENUE

35.  This Court has jurisdiction under 28 U.S.C. § 1331, in that claims are asserted under the laws of the United States; 28 U.S.C. § 1343(a), in that claims are asserted under laws providing for the protection of civil rights; and 20 U.S.C. § 1415, under 42 U.S.C. § 1983, 42 U.S.C. § 12182, and 29 U.S.C. § 794, *et. seq.*

36.  This Court has jurisdiction over Plaintiff's pendent State law claims pursuant to 28 U.S.C. § 1367.  Plaintiff also seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

37.  Venue is proper under 28 U.S.C. § 1391(b).

## FACTS

38. Y.T. was born in Egypt.  In 2008 Y.T. and his Parents relocated from Egypt to New York City ("NYC").

39. Y.T.'s family primarily speaks Arabic and has a limited ability to communicate in English. Prior to arriving in NYC, Y.T.'s language exposure was only to Arabic.

40. Y.T. displays a variety of deficits and interfering behaviors that are pervasive and transcend behavioral, communication, social, and physical domains. He has weaknesses and deficits in the areas of cognition, focus/attention, eye contact, socialization, expressive and receptive language, activities of daily living ("ADL"), behavior, gross motor skills and fine motor development.

41. Y.T.  is nonverbal, although he is starting to be able to make more consistent verbal approximations. He generally communicates by pulling people to what he wants.  He has very limited receptive language skills.

42. Although Y.T. was toilet-trained when he first arrived in NYC, he regressed until the summer of 2012.  For several years, he was having urination-related accidents at school. He is still not yet able to consistently communicate when he needs to use the restroom. Y.T. also holds his feces and, with the 1:1 ABA services he is learning to have a bowel movement in the toilet. Previously, he held his feces for one to two weeks, which resulted in explosive accidents.  During the 2012-2013 school year, Y.T. returned from the school bus covered in scratches and without most

of his clothing. Allegedly, he had an explosive bowel movement and then fought the aids who tried to assist him.

43. Y.T. exhibits highly self-injurious behavior. He will slam his head into walls and cause himself to bleed, at times requiring medical attention. He does not seem responsive to or deterred by pain.

44. Y.T. has the tendency to engage in extensive tantrums.

45. Y.T. exhibits sensory deficits and sensitivities. He is sensory seeking. He overreacts to loud noises, and cannot function in large crowds. He becomes anxious and hyperactive in response to loud noises, and reacts in ways that are dangerous to himself and others.

46. Y.T. exhibits hyperactivity at home and at school. He runs constantly, jumps and crashes into furniture and walls.

47. Y.T. lacks danger awareness and is a flight risk. He requires constant supervision. He has atried to run out of his house in the middle of the night; as a result, his father, M.G., has had to sleep in front of Y.T.'s door.

48. Y.T. exhibits self-stimulatory and perseverative behaviors which, left unchecked ,will continue for hours.

49. Y.T. requires educational services on a twelve-month basis, without which he would substantially regress.

50. Since Y.T. has started to receive home-based ABA, he has started to make slow progress in several areas, including but not limited to toileting, communication, attention, behavior and receptive language.

**The 2008-2009 School Year**

51. After arriving in NYC in 2008, Y.T.'s parents sent letters to the Defendants, stating that Y.T. was an autistic student in need of immediate special education placement and services. In their letters, the Plaintiffs notified the Defendants that they spoke very little English and were writing with the assistance of an English-speaking case manager.

52. The Defendants began evaluating Y.T. in September 2008.

53. The Defendants failed to follow proper procedures for obtaining written, informed consent from the parent prior to evaluating Y.T. and failed o administer necessary assessments to determine the language needs of the Plaintiffs and Y.T. in violation of the law.

54. Defendants failed to advise the Parents of their right to translation and interpretation services under federal, state, and city laws and regulations.

55. The Defendants' initial evaluation of Y.T. was substantively and procedurally insufficient and did not comport with federal and state law regarding the evaluation of students with disabilities.

56. Y.T. had not been in school at the time of the 2008 assessment.

57. The initial assessment consisted of a bilingual psycho-educational evaluation, a Social History, a speech and language evaluation an occupational therapy evaluation and a physical therapy evaluation.

58. A bilingual psycho-educational evaluation was conducted on September 6, 2008. At the time of the evaluation, Defendants were aware that Y.T. was not attending school.  This evaluation erroneously noted that Y.T.'s "level of autism is not severe," and provided no information or context to explain and/or substantiate that claim.  This evaluation was incomplete, and not aligned with professional and clinical standards.

59.  Defendants conducted a Social History interview with the assistance of an Arabic language translator in September 2008. The report from the social history stated that Y.T. was nonverbal, that he lacked the ability to protect himself from dangerous situations, and that he "requires directives and supervision for safety purposes." It further stated that Y.T. required a high level of attention and supervision in order to manage his behavior.

60. The Defendants' September 2008 occupational therapy ("OT") evaluation recommended that Y.T. receive OT services, work with a 1:1 Arabic-speaking paraprofessional, and receive a Physical Therapy ("PT") evaluation.  Defendants did not conduct a timely PT evaluation.

61. Defendants' October 2008 speech and language evaluator was unable to assess Y.T. in numerous areas. However, the evaluator recommended speech and language therapy ("SLT") five times per week for 60 minutes on a 1:1 basis.

62. Y.T.'s initial evaluation should have included a functional behavioral assessment ("FBA"), an observation, an assessment by an expert in autism and an assistive technology ("AT") evaluation, but the Defendants did not conduct any of those evaluations. Further, they failed to assess Y.T. in accordance with the specific provisions of the IDEA and state law governing evaluations. As a result, Defendants had insufficient information in order to make a recommendation. Further, whatever recommendation Defendants' IEP team could make was, in any event, constrained by blanket policies.

63. The Plaintiffs were not provided with information regarding the evaluation process in their native language or with translated copies of the evaluations and reports as required by state and federal law.

64. These initial evaluations were the only assessments that the Defendants had upon which to create IEPs and placements for the 2008-2009, 2009-2010, 2010-2011, 2011-2012 and 2012-2013 school years.

65. Before Defendants even held an IEP review, they created an Interim Service Plan ("ISP") for Y.T., recommending only that Y.T. attend a 6:1:1 classroom in District 75 with a 1:1 Arabic-speaking paraprofessional. There was no interpreter at the ISP meeting and none of the documents were translated for the parents.

66. The Defendants' school staff could not find an Arabic-speaking paraprofessional and thus the ISP was never implemented. Still, Defendants were legally obligated to either provide a bilingual Arabic-English class or an Arabic-speaking paraprofessional.

67. Y.T. began attending P.S. 255 in November 2008 and he remained there through the 2013-2014 school year. There was (and remains) no Arabic-language interpreter at the school. The Defendants never provided Y.T.'s Parents any school-related documents in Arabic during any of the years he attended until after February 2012, when the Plaintiffs filed for due process.

68. Y.T.'s initial IEP meeting was held on November 19, 2008.

69. The IEP team classified Y.T. as autistic and recommended that he attend a 6:1:1 special education class in District 75 with related services of SLT (1.5 hours per week) and OT on a 12-

month basis.  Following the November 2008 IEP meeting, the Defendants created an IEP, which they dated November 19, 2008 ("November 2008 IEP").  No paraprofessional was recommended and no Arabic-English services or interpreter were provided to Y.T. even though, at the time, he understood only Arabic.

70. The November 2008 IEP did not offer a FAPE to Y.T. on a substantive basis. Further, due to the lack of language access, procedural deficits, application of blanket policies and predetermination, Y.T. was denied a FAPE and educational benefit. Furthermore, the Plaintiffs were excluded from the special education process.

71. In preparing the 2008 IEP, Defendants ignored their own 2008 evaluations.  For example, the 2008 SLT evaluation recommended SLT 5 hours per week, but the IEP team recommended only 1.5 hours of SLT per week.

72. The 2008 IEP did not contain a Behavior Intervention Plan ("BIP").

73. On December 15, 2008, Defendants added physical therapy and adaptive physical education ("APE") to Y.T.'s IEP. The November 2008 IEP otherwise remained unchanged.  The Plaintiffs were not provided with a copy of the amended 2008 IEP.

74. Neither 2008 IEP was translated.

75. In the spring of 2009, Y.T.'s teacher submitted a "Type III Recommendation," requesting that the CSE initiate a 1:1 crisis management paraprofessional for Y.T. because "[his] behavior negatively impacts his learning and socialization. " Further, it noted that "he tantrums and exhibits aggression toward other students and adults," and "his impulsivity and lack of safety awareness can create dangerous situations for him and others."

76. Defendants' Type III process has been discontinued. The Type III conference process established that the Defendants pre-determined what they planned to recommend at Y.T.'s future IEP meeting.  This rendered IEP meetings that followed Type III meetings predetermined.

77. There was no interpreter at the Type III meeting and the Type III Recommendation form was not translated.

78. Y.T. did not make progress during the 2008-2009 school year.

79. Despite the fact that Y.T. was not making progress, the Defendants did not reconvene a new IEP meeting to add special education services, supports, or accommodations to Y.T.'s IEP during the 2008-2009 school year, nor did they reevaluate him.

The 2009-2010 School year

80. Y.T. continued to attend P.S. 255 for the 2009-2010 school year.

81. Defendants failed to offer Y.T. a FAPE for the 2009-2010 school year.

82. For the 2009-2010 school year, P.S. 255 testified at the hearing that they had determined that Y.T. should be moved to a more "structured" classroom and that he required implementation of the ABA methodology as part of his program. However, Defendants never added ABA to Y.T.'s IEP or specified on the IEP how many periods of ABA and/or 1:1 instruction that he required. Defendants were not able to testify or produce records to establish the amount, if any, of ABA that Y.T. received when he moved into a new class.

83. Defendants failed to prepare and offer an IEP before the school year started on July 1, 2009.

84. Defendants did not hold an IEP review meeting until October 29, 2009. There was no interpreter at the October 2009 IEP meeting and none of the documents related to the review were translated for the parents.

85. At the 2009 IEP meeting, Defendants failed to review Y.T.'s progress and goals from the prior year or make changes to the program to address any expected lack of progress, which is required by the IDEA as part of an annual review process.

86. After the October 2009 meeting, Defendants drafted an IEP dated October 29, 2009 ("the October 2009 IEP" ) and added a monolingual crisis paraprofessional.

87. The Section 504 regulations require Defendants to reevaluate children before making a substantial change to a child's educational placement. 34 C.F.R. §104.34. The addition of the paraprofessional and the change to a classroom that provided ABA constituted a significant change in educational placement so as to trigger the reevaluation provision of Section 504.

88. The paraprofessional was not adequately credentialed or trained. Yet, after the paraprofessional was added to Y.T.'s IEP, Y.T. spent most of the following school years receiving instruction from the paraprofessional.

89. Given Defendants' blanket policies, the paraprofessional was the only available special education service that Defendants' team could recommend: the team could not recommend any additional instructional time with a teacher, a 1:1 instructional program for all or part of the day, research-based strategies, ABA services in school, home-based ABA services, home-based parent training, toilet training in school or at home, an augmentative communication system or device, OT in a sensory gym, after-school related services or any other service that Y.T. required for a FAPE.

90. The remainder of the 2009 IEP was photocopied verbatim from the amended 2008 IEP, therefore demonstrating that Y.T. made no progress during the 2009-2010 school year.

91. Another IEP was drafted less than 2 weeks later, on November 10, 2009 (the "November 2009 IEP").

92. The November 2009 IEP team was comprised only of a special education teacher and Y.T.'s mother and, thus, was not duly constituted under the IDEA.

93. Plaintiffs were not provided with translation services at the meeting and no documents related to the review or IEP were translated.

94. The November 2009 IEP did not include a BIP; if a BIP was incorporated into the November 2009 IEP, it was without the parents' input, and was legally insufficient.

95. The 2008 and 2009 IEPs failed to contain information about Y.T.'s most recent evaluation or adequate present levels of performance. Further, the goals of the 2008 and 2009 IEPs were legally insufficient, in that they were not were not sufficiently detailed, measurable, or appropriate and failed to address each area of Y.T.'s disability.

96. Y.T. did not make adequate progress during the 2009-2010 school year.

97. Defendants failed to reconvene the IEP team during the year to address Y.T.'s lack of progress and failed to reevaluate him.

**The 2010-2011 School year**

98. Y.T. continued to attend P.S. 255 for the 2010-2011 school year.

99. Defendants failed to offer a FAPE to Y.T. during the 2010-2011 school year.

100.    Defendants failed to prepare and offer an IEP before the school year started on July 1, 2010.

101.    An IEP meeting for the 2010-2011 school year was not held until November 9, 2010.

102.    There was no interpreter at the November 2010 IEP meeting, and none of the documents considered at the review were translated for the parents.

103.    The November 2010 IEP "team" consisted only of a special education teacher and Y.T.'s father and, thus, was not duly constituted under the IDEA.

104.    After the November 2010 IEP meeting, the Defendants developed an IEP dated November 9, 2010 (the "November 2010 IEP"). The recommendation on the November 2010 IEP was the same as the recommendation on the prior IEP.

105.    The November 2010 IEP failed to contain information about the most recent evaluation or adequate present levels of performance.  Further, the goals of the 2010 IEP were legally insufficient, in that they were not sufficiently detailed, measurable, or appropriate and failed to address each area of Y.T.'s disability.

106.    The November 2010 IEP itself demonstrated a lack of progress during the prior year.

107.    Y.T. did not make adequate progress during the 2010-2011 school year.

108.    Defendants failed to reconvene the IEP team during the year to address Y.T.'s lack of progress and failed to reevaluate him.

**The 2011-2012 School year**

109.    Y.T. continued to attend P.S. 255 for the 2011-2012 school year.

110.    Defendants failed to offer a FAPE to Y.T. during the 2011-2012 school year.

111.    Defendants failed to prepare and offer an IEP before the school year started on July 1, 2011.

112.    The DOE convened an IEP meeting for Y.T. on November 7, 2011.

113.   Y.T. was not re-evaluated prior to the November 7, 2011 IEP meeting, although he was due for a triennial, three-year reevaluation.

114.   There was no interpreter at the November 2011 IEP meeting, and none of the documents considered at the review were translated for the father, who participated on the phone.

115.   The 2011 IEP failed to contain information about Y.T.'s most recent evaluation, or adequate present levels of performance. Further, the goals of the 2011 IEP were legally insufficient, in that they were not sufficiently detailed, measurable, or appropriate and failed to address each area of Y.T.'s disability.

116.   Again, despite an overall lack of progress, the November 2011 IEP team did not recommend any change in Y.T.'s program and services, in violation of the IDEA.

117.   In February 2012, through counsel, the Parents filed a due process complaint ("DPC") requesting an impartial hearing concerning the 2011-2012 school year and a separate hearing for compensatory education for the previous three years. These matters were consolidated before a single IHO by amended DPC in June 2012. Plaintiffs sought, among other things, compensatory education and an order for a new IEP that included increased speech and language services, 1:1 instruction in school and after school using research-based strategies, such as ABA, and assistive technology ("AT").

118.   After counsel requested the hearing, Defendants sent a letter to Plaintiffs requesting another IEP meeting in March 2012.

119.   Plaintiffs' counsel requested that a translator be present at the meeting. Defendants were unable to timely secure a translator.

120.   Plaintiffs advised Defendants' IEP team that Y.T. was not making adequate progress, and t requested the additional services sought here.

121.   At the March 2012 IEP meeting, despite the fact that two hearings were already pending, Defendants refused to consider any issue other than to correct a typographical error concerning their efforts to include the 1:1 paraprofessional on the IEP.

122.   Other than the correction of a typographical error, the **March 2012 IEP was identical to** the November 2011 IEP.

123.   Defendants refused to consider any substantive issues **concerning Y.T.'s education at the** March 2012 meeting.

124.   At the March 2012 meeting, the parents were given a **copy of an FBA dated October 10,** 2011 and a BIP dated October 31, 2011. Y.T.'s teacher admitted that **they had not previously been** provided to the parents and were not discussed at the November 2011 IEP meeting.

125.   The Plaintiffs were not a part of the FBA or BIP development **process were not provided** with written, informed consent for the FBA (which was legally required), **and in fact had no** knowledge that it had been conducted, despite the fact that the Parents **are supposed to participate in** the process of developing both documents.

126.   The FBA and BIP did not satisfy the specific requirements for **an FBA and BIP set forth** in the New York State Commissioner's Regulations.

127.   The March 2012 IEP failed to contain information about the **most recent evaluation, or** adequate present levels of performance.  Further, the goals of the March 2012 IEP were legally insufficient, in that they were not sufficiently detailed, measurable or **appropriate and failed to** address each area of Y.T.'s disability.

128.   The March 2012 IEP did not afford Y.T. a FAPE.

**Interim Decisions of the IHO & the 2012-2013 School Year**

129.   On April 20, 2012, the IHO issued an Interim Order regarding **evaluations, as the DOE** had not evaluated Y.T. since 2008.  Particularly, she ordered that the DOE **should conduct a** bilingual social history update and issue Assessment Authorizations ("AA[s]") **for independent OT** and PT assessments, and a bilingual speech evaluation, all of which were **to be translated into Arabic** for the Parents.  Further, she ordered that the DOE fund an Independent **Educational Education** ("IEE") by a behavior specialist.

130.   In May 2012, Dr. F., a Ph.D-level board certified behavior **analyst ("BCBA") and expert** in autism, conducted the IEE ordered by the IHO.  When Dr. F. visited **the school, she observed that**

the setting was not appropriate for Y.T. and did not see working on communication skills, receiving 1:1 support or any ABA. Among other things, Defendants claimed that Y.T. was using a picture exchange system ("PECS") to communicate; on the day she was there, Dr. F. did not observe him using PECS. Dr. F. did not observe Y.T. perform any of the skills that the Defendants' teachers claimed that he could perform in school when she later observed him at home.

131.    On June 25, 2012, the IHO issued a Second Interim Order finding that the record had established "the appropriateness of supplemental ABA services outside the school day to permit [Y.T.] to make educational progress." Further, she found that Y.T.'s behavior and self-management skills "clearly [had] not transferred to other settings." *Id.* Accordingly, she ordered the DOE to immediately provide Y.T. with 10 hours per week of after-school ABA services "at an enhanced rate" by either a bilingual provider or someone with access to a translator "so the parent[s] can learn to implement the ABA techniques in the home." *Id.*

132.    The Defendants began providing Y.T. with the 10 hours per week of ABA services in the summer of 2012.

133.    The Defendants and independent evaluators conducted reevaluations of Y.T. in the spring and summer of 2012.

**The 2012-2013 School Year**

134.    Y.T. continued to attend P.S. 255 for the 2012-2013 school year, which began on July 1, 2012.

135.    The Defendants did not develop a legally sufficient IEP that afforded Y.T. a FAPE by the start of the 2012-2013 school year.

136.    Defendants did not hold a timely IEP meeting to consider the independent evaluations.

137.    Y.T. started the 2012-2013 school year with the March 2012 IEP, which had actually been developed in November 2011, before Defendants had received the DPC.

138.    On October 26, 2012 the IHO issued a Third Interim Order increasing Y.T.'s after-school ABA services to 15 hours per week, including a minimum of 4 hours per month of BCBA supervision and 4 hours per month of parent counseling and training, having found that Y.T.

continued to have "significant interfering behaviors" and that the record supported the additional home-based services. She noted that it was "imperative that there be communication between [the] providers and the Arabic-speaking parents," and, thus, ordered that translation must be available for the counseling and training sessions.

139. After the Third Interim Order, Defendants started to provide ABA services, BCBA supervision and parent training consistent with this order.

140. At the hearing, Defendants did not object to the entry of the interim orders.

141. Defendants complied with all three of the interim orders and did not seek a stay of any of the orders. Nor did they appeal any of the interim orders as a violation of pendency.

142. Y.T. remained in P.S. 255 during the entire 2012-2013 school year.

The 2013-2014 School Year

143. As of the start of the 2013-2014 school year, Defendants had yet to have one of its IEP teams consider any evaluations except for the original 2008 reports conducted five years earlier, before Y.T. received any special education services.

144. In January 2013, Defendants held an IEP review (the "January 2013 IEP meeting").

145. By the time of the January 2013 IEP review meeting, Plaintiffs had provided Defendants with the IEE conducted by the expert in autism, the progress reports of the home-based ABA providers, and a speech evaluation from the same pathologist who evaluated Y.T. in 2008; that report continued to recommend five hours per week of SLT. Defendants also had an occupational therapy report, physical therapy report and an assistive technology evaluation that they had conducted.

146. After the meeting, Defendants issued an IEP (the "January 2013 IEP"). The Parents were not allowed to be part of the process of drafting the IEP.

147. The January IEP failed to include any special education program or placement recommendation; the section of the IEP that details the special education services was left blank.

148.   The January 2013 IEP team was provided with extensive and conclusive evidence that Y.T. had started to make progress with his home-based services and required ABA to make progress. They were also presented with evaluations that recommended an increase in SLT.

149.   Yet, Defendants maintained the identical program; the only addition was a monthly 45 minute monthly session of parent training (without an interpreter) offered at the school.

150.   Again, Defendants did not offer any bilingual services.

151.   Moreover, Defendants had conducted their own Assistive Technology ("AT") evaluation with which the Parents disagreed.

152.   The AT evaluation that was conducted by the DOE was legally insufficient.  Instead of assessing Y.T. with respect to a range of AT device, Defendants only assessed him with respect to the PECS system, because Defendants' staff restricted the assessment to a review of PECS. However, Defendants had a conflict of interest with respect to making the referral for the evaluation. The AT team reviewed only two documents as part of the AT evaluation – Defendants' referral form and his most recent IEP. The evaluation lasted only one hour and consisted only of interviews with Y.T.'s teachers and providers and then a brief observation of Y.T. The AT evaluators observed Y.T. using his PECS book (with prompting and no independence). After interviews with Y.T.'s teachers, the AT team noted that Y.T. "does not request actions, does not link multiple symbols to make requests using adjective symbols," and "does not move the 'I want' symbol onto his sentence strip.  Moreover, the AT evaluator erroneously determined that Y.T. "showed no interest in the iPad and did not attempt to obtain it for exploration," and, therefore, that he would not benefit from an iPad as an AT device.  However, this report was incorrect; in fact, Defendants' 2013 IEPs note that use of the iPad is one of Y.T.'s strengths.

153.   The manner in which Defendants' AT teams evaluate autistic students is not in compliance with the IDEA and is restricted by the amount of time available, a long waiting list for evaluations and insufficient ability to trial equipment as part of the evaluation.

154.   Thus, even though Y.T. still does not speak or use PECS independently after five years, his IEP still fails to include any augmentative communication device, software, or training to use it.

155.    Prior to the January 2013 IEP meeting, Defendants failed to conduct a legally sufficient FBA and BIP. Disturbingly, the IEP states that the school's plan is to use string as a primary reinforcer. This statement contradicts the testimony of the teachers in the hearing who claimed that they no longer use the string to reinforce Y.T.'s positive behavior.

156.    In May 2013, Defendants apparently contacted the father to request that he participate in an IEP meeting. He did not understand that an IEP meeting was being held, and he did not receive adequate notice.

157.    Defendants failed to invite any of Y.T.'s home-based providers or solicit updated information from them, despite the fact that Defendants were funding the program at the time.

158.    Defendants failed to alert Plaintiffs' counsel that this meeting was being convened.

159.    Although four months had elapsed between the November 2011 IEP meeting and the May 2012 meeting, Y.T. made no progress in school according to the IEP.

160.    The only changes made to the IEP were to add a 6:1:1 classroom on to the document.

**The IEPS Were Substantively and Procedurally Invalid and Denied Y.T. a FAPE**

161.    Overall, the DOE's IEP development process, resulting IEPs, programs and placements for Y.T. during the years in question have been substantively and procedurally flawed for reasons including, but not limited to, the following:

    a.    The Defendants failed to employ proper procedures in scheduling and notifying the Plaintiffs about meetings;

    b.    The Defendants failed to make decisions about Y.T. based upon his individual needs;

    c.    The Defendants made decisions about Y.T.'s IEP and placement based on blanket policies, administrative considerations, and resources;

    d.    The Plaintiffs were not provided with documents including meeting notices, IEPs, evaluations, reports, waivers, and notices of their rights in their native language and were not provided with translation and interpretation services at meetings regarding Y.T.'s education;

e.   Defendants failed to properly explain the special education process to the Plaintiffs in their native language; moreover, by failing to translate key records, participation by the Plaintiffs was impossible;

f.   Any IEP meeting notices the the Plaintiffs have received have not included information regarding all of the individuals who would make up Y.T.'s IEP team and/or what documentation and records were going to be considered at the meeting;

g.   For all of the school years in questions, Defendants failed to conduct legally adequate evaluations and reevaluations upon which to base its IEPs;

h.   The Plaintiffs were not provided with advance notice or copies of evaluations and reports that the IEP teams would be considering at the meetings, they were not asked for input regarding what materials should be considered;

i.   Defendants never provided the Plaintiffs with legally sufficient notice of their rights and Prior Written Notice as defined under the IDEA throughout the years in question. Upon information and belief, no such notices were provided to the Plaintiffs and, if they were, they were not provided in the Plaintiffs' native language or in a manner that would ensure their understanding of the content contained therein;

j.   The IEP teams have not been duly constituted. Upon information and belief, the teams did not have required members and, even where certain individuals were present in name/title, they did not possess the required knowledge, training, and independence to formulate a legally valid IEP;

k.   The members of the IEP teams have not been vested with sufficient authority and autonomy to perform their mandated duties with respect to Y.T. and students like him;

l.   The DOE has not conducted adequate observations of Y.T.;

m.   The IEPs were drafted before or after the meetings, and the Plaintiffs were not provided with drafts to review;

n.   The IEPs have not adequately described Y.T.'s strengths, weaknesses, abilities, progress, academic and functional levels, the ways his disability impact him in and out of the classroom and contain conflicting information;

o.   The IEPs have failed to include peer-reviewed, research-based methods, although such methods were feasible;

p.   The IEP goals have been insufficient; they have not been measurable or individually tailored to Y.T.'s needs, and they have failed to sufficiently address the ways his disability impact his academic, social-emotional and behavioral functioning as well as his ability to engage in ADL tasks, communicate, and participate in appropriate leisure activities;

q.   The IEP goals from year to year have failed to address a lack of progress on the prior years' goals or appropriately and logically follow Y.T.'s prior goals;

r.   Defendants inappropriately and without proper basis determined that Y.T. should receive services in English without the support of an Arabic-speaking clinician or translator;

s.   The IEPs have referenced that non-descript "ESL methods and materials" are utilized; however, Y.T. has not been provided with appropriate ESL/bilingual services;

t.   Defendants have not conducted FBAs or developed BIPs in accordance with the law;

u.   Defendants failed to consider or recommend  appropriate AT for Y.T.;

v.   The IEPs have not recommend special education services and supports that were adequate to address Y.T.'s areas of weakness and significant delays;

w.   The IEPs have not contained services that are adequate to address Y.T.'s interfering behaviors, including positive behavioral supports;

x.   Y.T.'s related services have been inappropriate and insufficient;

y.    For most years, the IEPs have not included parent training as a related service and, upon information and belief, the IEP teams did not consider or discuss parent training as a related service;

z.    Despite the fact that Y.T. exhibits significant deficits in his ability to generalize skills and information across environments, Defendants have not considered or recommended after-school/home-based services for Y.T.;

aa.   Overall, the IEPs, program, and placement have not included appropriate services and/or goals for Y.T. to address generalization, his lack of awareness of danger, his toileting needs, and ADL;

bb.   The IEPs have not offered sufficient 1:1 instruction for Y.T.;

cc.   The IEPs have not adequately addressed Y.T.'s lack of progress;

dd.   The IEPs did not include ABA;

ee.   The evaluation, IEP development, and placement processes have not met the standards for providing a FAPE to children with autism as set forth in the New York State Regulations; and

ff.   Defendants failed to provide the Plaintiffs with adequate Prior Written Notice throughout the evaluation process(es), before and after the IEP meetings, and at other legally required times throughout the years in question.

162.   Substantively, none of the IEPs created during the years in question offer a FAPE, and the recommendations contained therein were not reasonably calculated to confer educational benefit to Y.T. Further, Plaintiffs were substantially excluded from the special education process.

**Defendants Violated Plaintiffs' Language Access and Due Process Rights in a Wholesale and Systemic Fashion**

163.   Parents' rights under the IDEA are so important that proof of a procedural violation that "significantly impeded the parent's opportunity to participate in the decision-making process" (such as

the failure to provide translation and/or interpretation) compels a hearing officer to find that FAPE has been denied to a child. 20 U.S.C. §1415(f); 34 C.F.R. §300.513(a)(2).

164.    "Native language" is defined under the IDEA as the "language normally used" by the parent. 34 C.F.R. § 300.29(a)(1).

165.    The Plaintiffs' "native language" and primary language is Arabic. Defendants are aware of this fact and do not dispute it.

166.    One of the purposes of the IDEA is to ensure that the rights of parents of children with disabilities are protected. Toward that end, the IDEA affords parents of a child with a disability a procedural right to "inspect and review all education records" and "participate in meetings" regarding "the identification, evaluation, and educational placement of the child" and the "provision of FAPE to the child." 34 C.F.R. 300.501(a-b).

167.    To ensure meaningful participation, education-related information and rights must be provided in a parent's native language. 34 C.F.R. §300.322(e); 8 N.Y.C.R.R. §200.5(d) (IEP teams must "take whatever action is necessary to ensure that the parent understands the proceedings" at the IEP meeting "including arranging for an interpreter for parents...whose native language is other than English"); 34 C.F.R. §300.9 (a parent must be "fully informed of all information relevant to the activity for which consent is sought"; consent must be in a parent's native language).

168.    Districts must also provide "Prior Written Notice" ("PWN") before any change or refusal to initiate or change the "evaluation or educational placement of the child, or the provision of" a FAPE. 20 U.S.C. §1415(b)(3)(B). Prior Notice must be individualized and contain, among other things, a description of the action proposed or refused by the district, an explanation of why the action is being proposed or refused, and factors relevant to the decision. 20 U.S.C. §1415(b)(3)(B); 8 N.Y.C.R.R. §200.5(a)(5)(i) (additional information is necessary for evaluations). Districts must also provide Procedural Safeguards that advise parents of their rights under the IDEA. 20 U.S.C. §1415(d)(2)(E).

169.    Notice and Safeguards must be "written in an easily understandable manner" and translated into a parent's native language. 34 C.F.R. §§ 300.9, 300.503, 300.504(d). The IDEA does not afford

23

districts the ability to seek a waiver or allow a parent to opt out from their receipt of translated documents. The New York State Commissioners Regulations mirror the above requirements for translation and interpretation services. 8 N.Y.C.R.R. §§200.5(a)(4), (d), (f). Further, the regulations mandate that "[e]valuations should be translated into a parent's native language." 8 N.Y.C.R.R. §§200.4(b)(6)(1)(a-d).

170.    Additionally, the U.S. Department of Education interprets Section 504 to require that districts provide education records to parents in their native language and offer interpreters at meetings.

171.    Moreover, Title VI of the Civil Rights Act of 1964 and the Defendants' own regulation, Chancellor's Regulation A-663, required them to provide translation and interpretation services.

172.    In 2008, Mayor Bloomberg issued an Executive Order entitled "Citywide Policy on Language Access to Ensure the Effective Delivery of City Services" (the "Executive Order"). NYC Exec. Order No. 120 (July 22, 2008). The Executive Order also reflects that it was implemented in response to Presidential Executive Order 13166, which requires agencies receiving federal funds to take "reasonable steps" to ensure that Limited English Proficient ("LEP") individuals have access to the agencies' programs and services.

173.    In response to the Executive Order, Defendants promulgated both a Language Access Plan and a Chancellor's Regulation A-663 ("CR-A663"). Under the Chancellor's Regulation and the Language Access Plan, the DOE requires language access services in the eight most common languages other than English, with Arabic being one of the eight languages.

174.    Under CR-A663, schools must determine the "primary language" spoken by each parent. Further, each school and office is required to provide "translation and interpretation services" to all parents who do, in fact, require language assistance in order to communicate with the Department. The foregoing requires translation of documents regarding students' special education and related services as well as interpretation services.

175.    New York State law mandates that Defendants must follow their own regulations and thus provides an independent basis for finding Plaintiffs rights were violated.

176.    The record at the hearing showed that the Defendants' documents noted in several places that Arabic was Plaintiffs' native language and yet they: (a) never provided any PWN or Safeguards to Plaintiffs in English or in Arabic; (b) never provided any educational records, notices, or documents in Arabic to Plaintiffs; and (c) provided an interpreter only at the initial evaluations, the November 2008 IEP meeting, and the hearing itself.

177.    Further, for the 2012-2013 and 2013-2014 school years, Defendants failed to provide PWN in any language and also failed to translate any educational records, except for meeting notices.

178.    Defendants' boilerplate forms for notice and their timing of notice do not meet the mandatory requirements of PWN in the statute and regulations. Defendants failed, during the years in question, to provide PWN to all parents in New York City and this systemic practice harmed Plaintiffs.

179.    Defendants' procedural safeguards are not written in a manner consistent with the federal requirements in that they are not understandable to the general public.

180.    The Defendants' failure to provide interpreters and translated materials during the years in question was and is part of a systemic failure to provide language access to Parents of children with special needs whose native language is Arabic.

181.    According to Defendants' 2013 Demographic Report, prepared by the New York City Department of Education's Division of Students with Disabilities and English Language Learners "2013 Demographic report ") there are 159,162 English Language Learners ("ELLs") in New York City.  Approximately 21.6% of the total ELLs (37,372) have IEPs. In 2013, approximately 3.7% of all the above ELLs were Arabic speaking.  It is not clear whether these numbers include preschool students with disabilities; if they do not, the population is larger.

182.    In a 2007 demographics report, Defendants noted that the distribution of languages over the special education population was consistent with the distribution of language over the general education population.  Applying the 3.7% statistic across the population of ELLs with IEPs, there would be at least 1,345 families of school-age children with disabilities whose native language is Arabic and whose Parents' native language is likely Arabic.

183.    Further, it is likely that the number of parents whose native language is Arabic is larger than 1345, based on Defendants' observations in a 2007 report, which states that there are many more Parents whose first language is not English than there are students classified as ELLs. Thus, there may be students whose Parents' are ELLs, although the students themselves are no longer classified as ELLs.

184.    Although Defendants have created a translation unit, Defendants have not ensured adequate access to translation and interpretation for Arabic-speaking families. They have not trained their staff, supervised their staff, or enforced the existing laws and regulations with respect to language access.

185.    In the hearing, Defendants' witness admitted that the translation unit is not available to translate individual special education student records and parent notices.

186.    Further, Defendants often use phone interpreters at IEP meetings where English-only documents are being reviewed. Defendants' phone-language line does not allow for fax or email transmission of educational records. As a result, the phone interpreters cannot translate or read the Parents the documents that are being reviewed. In addition, at an IEP review, a phone interpreter cannot provide simultaneous interpretation and thus the interpretation is not accurate.

187.    Nor do Defendants' policies offer time before IEP reviews for a parent to meet with an interpreter to review the evaluations, progress reports, and goals that will be discussed at the IEP review, thereby leaving them wholly unprepared and unable to participate in the process in a meaningful way.

188.    Defendants have also failed, in a systemic way, to ensure that they comply with the IDEA and Section 504 with respect to the provision of interpreters and translation of documents ("language access") for those parents whose native language is not English and to issue notices pursuant to Section 504 to Plaintiffs.

**Defendants Failed to Provide Adequate Bilingual Educational Services and Address Y.T.'s Language Needs**

189.    The IDEA requires Defendants to "consider the language needs of the child as those needs relate to the child's IEP" for any child such as Y.T. who is considered Limited English Proficient ("LEP"). 34 C.F.R. §300.324.

190.    New York State law also mandates bilingual instruction for children who are legally considered to be English Language Learners ("ELLs"). If a language other than English is spoken at home, the Language Assessment Battery-Revised (LAB-R), which is designed to determine language proficiency, must be administered.  If a child is not able to pass this test, they are designated as ELLs.

191.    The New York State Education Department has clarified that students with disabilities who cannot pass this test must be designated as ELLs. Students remain current ELLs until they earn proficient scores on the NYSESLAT or otherwise are able to obtain an exemption.

192.    Throughout the years in question, Defendants failed to provide Arabic language instruction to Y.T.  Further, Defendants do not operate or contract with sufficient Arabic-English programs and services for children with autism.

**Defendants' Staff Apply Blanket Policies with Respect to Provision of Special Education Services to Children with Autism**

193.    District 75 is a segregated school district, which contains four ratios of special education classrooms to which children are generally assigned by classification. 6:1:1 classrooms are for autistic children, 12:1:4 classrooms are for children classified as multiply disabled, and 8:1:1 classrooms are generally for children classified as "emotionally disturbed," although there are a small number of autistic children assigned to that ratio.  Lastly, 12:1:1 classrooms are for children who are classified as "intellectually disabled" or "emotionally disturbed" depending on the school building.

194.    The Defendants' statistics show that more than 80% of the children classified as autistic are placed in 6:1:1 programs in District 75.  In most districts, Defendants' staff take the position that

6:1:1 is the only classroom available for the majority of autistic children. Defendants have a handful of programs for higher-functioning autistic students and those formerly diagnosed with Asperger's syndrome.

195.    Defendants' general policy and practice is that IEP teams have very limited authority in terms of what they can recommend; there is a ban on IEP recommendations for various types of services. Further, if a school team makes a recommendation, the services come out of the individual school's budget; if a parent files for due process, the funds are allocated from a central source.

196.    In New York City Parents must request a due process hearing if their child requires any but the most limited services on the Defendants' menu.

197.    For example, Defendants' IEP teams are not allowed to include ABA on a child's IEP, regardless of whether that child requires ABA services. In fact, Defendants' IEP teams are not allowed to recommend any methodology.

198.    Further, Defendants' IEP teams are not allowed, in general, to make recommendations for home-based or after-school services if a child is already assigned to a program during the day.

199.    Defendants' IEP teams are not allowed to recommend special education services after school hours outside of the school building, except: (a) for a limited program called "home instruction," which supplants and does not supplement the school-day portion of a program; or (b) if Defendants cannot implement school-based related service mandates, they can issue a voucher to permit a parent to obtain them after school.

200.    Defendants' IEP teams are not allowed to recommend 1:1 instruction for all or part of a day for a child in a 6:1:1 class; the IEP team's only option is to recommend a paraprofessional who can redirect behavior and whose only job requirement is a high school diploma.

201.    Although each 6:1:1 class is programmatically different, the nuances of the placement (which should be on the IEP) are never included on an IEP; instead, decisions about program are made by a placement office that simply finds an available seat in a school that has a 6:1:1 class with appropriately aged children. Defendants call the decision to assign children to schools a "placement

28

decision," however, given the fact that each school and class are **different, these placement offices are** usurping functions that should belong to the IEP teams.

202.    Thus, program decisions that should be part of the IEP **are improperly delegated to these** individuals who are not part of the IEP team.

203.    Defendants have illegally stripped IEP teams of the **authority that the teams are supposed** to have under the IDEA and have restricted their ability to make decisions **about special education** services, supports, accommodations, and related services.

204.    The IEP teams have predetermined recommendations on Y.T.'s IEPs and have applied illegal blanket policies to their recommendations for Y.T.

205.    Upon information and belief, the 6:1:1 recommendation **has been made for Y.T. year** after year simply because it is the smallest classroom ratio available **through the DOE, regardless of** Y.T.'s individual need.

206.    If Defendants' IEP teams have already recommended a school-day program in District 75, they are not allowed to recommend another program or placement.

207.    Defendants' IEP teams recommend and provide services based on availability.

208.    Defendants do not offer parent training in the home, and most teams **have not been able** to include it on the IEP at all.

209.    Defendants do not offer toilet training services in the home.  In fact, **Defendants do not** offer toileting services to children in 6:1:1 classroom.

210.    Upon information and belief, the Defendants' IEP teams **are not able to recommend a** non-public school and have improperly delegated their authority to a **case manager in a central office** who reviews and either accepts or rejects the team's request.  If it is rejected, **the IEP team must** return a child to District 75.

**The IHO's Findings of Fact and Decision**

211.    The IHO issued Findings of Fact and Decision (the "IH Decision") on or around February 11, 2013.

212.    The burden of proof was on the Defendants with respect to **all issues in the hearing.**

29

213.    Although Defendants failed to carry their burden and Plaintiffs presented significant evidence supporting their allegations and requests for relief, the IH Decision erroneously failed to rule on all issues for the Plaintiffs.

214.    The IHO found that the Defendants had failed to provide a FAPE to Y.T. for the 2011-2012 school year and ordered that Y.T. should continue to receive weekly 1:1 ABA services with parent training and interpreter services similar to the Third Interim Order, although she increased the weekly mandate to 20 hours.   This aspect of the IHO's decision is not being challenged.

215.    However, the IHO erroneously ruled that, even though the Defendants denied Y.T. a FAPE in the 2011-2012 school year, the 6:1:1 classroom with a paraprofessional was "appropriate."  Further, she incorrectly determined that the home-based ABA services are only appropriate if "the student is not receiving full-time ABA instruction in school."  While the IHO correctly added ABA Services to Y.T.'s program, she was wrong as a matter of law and based on the evidence to: (a) find the 6:1:1 program "appropriate" and (b) limit the provision of ABA services if Y.T. moves into a full-day ABA program.

216.    The IHO's order limiting the ABA services disregarded the evidence establishing that Y.T. has extreme difficulty with generalizing his skills between people and settings.

217.    Children who are typically developing can gain benefit from education afforded to them by New York State without needing accommodations to help them to learn skills in different settings or around different people. However, Y.T. does require services, such as home-based ABA, so that he can benefit to the same extent as his non-disabled peers.

218.    He also requires these services as part of a FAPE.

219.    The IHO's decision was also ambiguous, contrary to the evidence and the law, and not well-reasoned as to most of the legal issues.

220.    For the 2008-2009, 2009-2010 and 2010-2011 school years, the IHO was wrong, as a matter of law and in light of the evidence, to find that the Defendants had offered a FAPE and did not violate Plaintiffs' procedural rights for all of the reasons set forth herein.  Instead of relying upon evidence in the record to support her findings, her statements are merely conclusory and vague.

221.    The IHO's decision was not clear, in terms of the 20091-2010 and 2010-2011 school years. To the extent that the IHO found that FAPE was denied for the 2009-2010 and 2010-2011 school years, but that compensatory education was not warranted, her decision with respect to compensatory education should be reversed..

222.    The IHO was also wrong not to award compensatory education and not to order the additional relief that Plaintiffs requested, as Defendants failed to meet their burden or to rebut Plaintiffs' evidence on any issue.

223.    As to all of the school years before the IHO she should have determined that (a) the evaluations were legally insufficient; (b) Defendants failed to consider the recommendations in the evaluations that they did have; (c) Defendants did not address Y.T.'s need for Arabic language-appropriate instruction; (d) the IEPs were substantively and procedurally invalid; (e) Defendants excluded the Plaintiffs by denying them language access services; (f) Defendants failed to provide legally valid FBAs, BIPs, and positive behavioral supports; (g) Defendants failed to rebut the overwhelming lack of progress and contradictory information in evidence; (h) the IEPs and placements did not substantively address Y.T.'s delays in communication, attention, ADL tasks, social skills, knowledge and understanding of danger, or his self-injurious, preservative and hyperactive behavior; (i) the evidence showed that the recommendations were made pursuant to a predetermined decision and blanket policies; and (j) Y.T. should have been awarded the services and instruction sought by the Plaintiffs.

224.    The IHO was also wrong, as a matter of law, and the weight of the evidence does not support the IHO's findings that Defendants "made reasonable efforts to communicate" with the Plaintiffs and then weighed this finding as an equitable factor against the Plaintiffs.

225.    Next, the IHO erred as a matter of law and the weight of the evidence does not support the IHO's findings that Y.T. was not entitled to compensatory services because the Plaintiffs did not provide Defendants with information about Y.T.'s behavior at home. Instead, she should have found that the 2008 evaluations contained information about Y.T.'s behavior at home, the Defendants' failed to involve the Plaintiffs in the FBA process, and the Defendants failed to conduct a valid re-

31

evaluation and social history. Further, she ignored the Plaintiffs' contention that his lack of progress in school justified the award of additional services.

226.    First, the Defendants conducted no reevaluation during the entire years in question until the IHO ordered one. It was the Defendants' duty (not the Plaintiffs') to ensure they were offered a meaningful opportunity to participate in evaluations (including FBAs) and that information regarding Y.T.'s behavior outside the classroom was taken into consideration. Further, there was no evidence that the Parents knew that this information was in any way relevant to the services that they could get for their child.

227.    Moreover, it was not only Y.T.'s lack of progress and issues at home that formed a basis for the Plaintiffs' request for additional services. They also requested those services based upon a demonstrated lack of progress in school, of which Defendants were fully aware.

228.    The IHO was incorrect as a matter of law and in light of the evidence to have ruled against the Plaintiffs on any claims.

229.    Further, as asserted herein, the language access claims are not, as the IHO found, moot. Plaintiffs have yet to have the evaluations and IEPs translated and are continuing to be denied adequate due process and language access services.

230.    The IHO was also wrong to rule for the Plaintiffs on all of the claims that they raised in the DPC, on the record and in the closing memorandum, which she improperly ignored.

**The Appeal to the State Review Officer**

231.    Defendants' initially declined to appeal the decision and allowed their appeal date to lapse. Had Plaintiffs not appealed, the IH Decision would have become final and binding upon Defendants.

232.    Plaintiffs filed their Petition appealing portions of the IHO's decision to the State Review Officer ("SRO") on March 25, 2013. Following the submission of the Petition, Defendants requested an extension of approximately two months and submitted an Answer and Cross-Appeal.

233.    During the time between the issuance of the Final Decision and the date of the Parents' Petition (and during the period of Defendants' extension), the Defendants provided the 1:1 home-based ABA services that were ordered by the IHO.

234.    Defendants did not seek to immediately terminate the services by filing an appeal with the SRO.

235.    However, once Plaintiffs appealed the portions of the Final Decision that were unfavorable to them, Defendants' lawyers decided to appeal the portions the IHO's decision that ordered ABA services and found a lack of FAPE in the 2011-2012 school year.  Instead of immediately cross-appealing, Defendants asked for extensions of time to submit their cross-appeal. Almost nine weeks later, Defendants submitted their cross-appeal.

236.    Starting on May 30, 2013, Plaintiffs' counsel called and wrote to Defendants' counsel to ascertain their position on whether they planned to discontinue the 1:1 ABA Services.  Plaintiffs' counsel made clear that they would need to seek emergency relief in court if Defendants had contemplated unilaterally terminating the home-based program.

237.    Between May 30, 2013 and June 28, 2013, Plaintiffs counsel and Defendants' counsel exchanged emails and phone calls concerning whether the issues alleged herein, including the 2012-2013 and 2013-2014 school years and systemic claims, would proceed to Court and be the subject of an emergency motion.  Finally, on June 28, 2013, Defendants' counsel informed Plaintiffs' counsel that the 1:1 ABA Services would terminate as of the end of the 2012-2013 school year, on June 30, 2013.

238.    The 2013-2014 school year begins on July 1, 2013; Defendants' extended school year program does not start until July 3, 2013.  If Defendants' had not terminated the ABA services, they would have resumed on July 3, 2013.

239.    Due to Defendants' actions starting from the beginning of the hearing to date, they have agreed to change Y.T.'s then-current placement. Y.T.'s 1:1 ABA Services are now part of his then-current and/or last-agreed upon educational placement.

240.    In the alternative, even if 1:1 ABA services are not yet part of his stay-put placement, if Plaintiffs prevail in the underlying appeal, those services will become part of the last agreed upon placement and will be retroactive to the 2013-2014 school year.

241.    Even if the services are not part of the stay-put, they should be continued and the additional services should be ordered by the Court, because the Plaintiffs can satisfy the factors for a preliminary injunction.

242.    If the 1:1 ABA services terminate, Y.T. will suffer irreparable harm.

243.    Y.T. and his Parents will also suffer irreparable harm if he has to wait years to resolve Plaintiffs' underlying claims concerning his school-day program, SLT services, augmentative communication, and language access.

**Plaintiffs' 2008-2009 and 2009-2010 Claims are Not Time Barred**

244.    Plaintiffs' IDEA claims are not time-barred because they were filed within two years of the date on which Plaintiffs knew or should have known of the claims.

245.    Plaintiffs' IDEA claims are not time-barred because their time to file was extended, because the Defendants failed to provide them with due process rights as alleged herein and misrepresented facts to them, which misled them and prevented them from filing for due process.

246.    Plaintiffs' IDEA claims are not time-barred because Defendants have waived this defense by failing to raise it at the impartial hearing. By belatedly raising the SOL defense in the appeal to the SRO, Defendants deprived Plaintiffs from presenting and rebutting factual evidence as well as calling and cross-examining witness with respect to the issues pertaining to claim accrual and the exceptions.

247.    Plaintiffs' Section 504 and Section 1983 claims are not time-barred because they were filed within three years of the date on which Plaintiffs knew or should have known of the claims and are subject to state tolling.

**Plaintiffs Should not be Required to Exhaust Their Administrative Remedies, as the Administrative Process Will be Futile and Ineffective for Plaintiffs**

248.    Plaintiffs are not required to exhaust their administrative remedies for several reasons.

249.    The situation with respect to the impending termination of Y.T.'s services presents an emergency.

250.    Plaintiffs seek to enforce pendency and pendency issues do not have to be exhausted.

251.    Plaintiffs are not required to exhaust their administrative remedies, as the hearing process is too ponderous to meaningfully address Y.T.'s needs; the hearing case has already been pending for more than one year.

252.    The IHO had the authority to issue interim relief, and the only mechanism for Plaintiffs to obtain continued enforcement is through a judicial action.

253.    If, in the alternative, the IHO did not have authority to issue interim relief, then Plaintiffs' only remedy is to seek an injunction and request equitable relief from the Court, and there is no further requirement to exhaust remedies.

254.    The current IHO system is fraught with delays.  The SRO has just been sued by two separate law firms alleging extensive delays in the SRO's issuance of decisions; the SRO decisions are supposed to be issued 30 days, but they are delayed in some cases six months to one year.

255.    Further, it has historically taken take four or five years for a contentious due process case to resolve itself. Now, given the extensive delays at the SRO, the timeframe is likely to be longer by one or more years.

256.    Plaintiffs are not required to exhaust their administrative remedies to the extent that they raise systemic policy and practice claims.

257.    Plaintiffs are not required to exhaust administrative remedies, because they seek discovery concerning the educational services being provided to Y.T. that can only be obtained through the federal court procedures.

**Plaintiffs Should not be Required to Exhaust Their Administrative Remedies, as the Administrative Process is Infirm Under the IDEA and Section 504**

258.    The IDEA mandates that individuals who file for due process are entitled to an impartial fact finder who is (a) free from financial conflicts and other conflicts of interest, (b) knowledgeable about the applicable laws, and (c) able to preside over hearings and write decisions in a manner consistent with generally acceptable legal standards.

259.    New York's system is not impartial due to the actions of the State Educational Agency ("SEA") (NYSED) and the Commissioner of Education.

260.    Although there is a two-tiered system in New York and hearings are supposed to be held at the district level by independent hearing officers, NYSED is fully responsible for selecting, training, monitoring, and controlling IHOs who serve at the local level.

261.    Although IHOs are supposed to be independent contractors, NYSED has control over their finances and reputation as if they were employees.

262.    NYSED – while not a named party in each hearing – is a guarantor of FAPE under the IDEA and is responsible for the provision of a FAPE if Defendants are unwilling or unable to provide it.

263.    NYSED also has an obligation to monitor Defendants' compliance with the IDEA and to ensure that Defendants maintain adequate policies and procedures under the IDEA.

264.    NYSED has a financial interest in the outcomes of due process administrative proceedings.

265.    NYSED has continually proposed legislation, regulations, and policy changes that would curb the rights of parents in an effort to reduce special education costs and to limit parents' access to and recovery in impartial hearings.

266.    The SRO, who resides over appeals of hearings, is also required to be impartial.

267.    A federal court has already ruled that the Commissioner, as an employee of NYSED, cannot serve as the SRO under the IDEA.

268.    Yet, the SRO is an employee of NYSED, serves as Assistant Counsel for NYSED, and serves "at the discretion of the NYSED Commissioner."

269.    According to his job description, in his role as Assistant Counsel, the SRO is responsible for working with the senior staff of NYSED to develop and implement NYSED policies.

270.    As its attorney, the SRO also owes a duty of loyalty to NYSED, which renders him legally unable to serve as a neutral fact-finder in administrative proceedings in which NYSED has a financial interest.

271.    If the Commissioner is not able to serve as the SRO, a high-ranking official who serves at his discretion and is both an employee and a lawyer for the agency should be deemed to possess an even greater conflict of interest and should also be prevented from serving.

272.    The SRO and NYSED have undertaken a campaign to investigate and find IHOs guilty of misconduct and incompetence due to the failure of IHOs to adhere to state timeline regulations for hearing decisions.

273.    NYSED has done so pursuant to regulations promulgated by the Commissioner, which, among other things, prohibit IHOs from granting extensions to both parties for purposes of settlement.

274.    The SRO has been issuing these decisions on a *sua sponte* basis, even when neither party raises issues on appeal concerning IHO misconduct and/or timeline extensions and even where both parties have agreed to the extensions as per the IDEA's rules.

275.    The SRO's conduct has recently resulted in a public suspension of a long-standing IHO, and another IHO who, after being publically sanctioned, resigned as an IHO.

276.    Experienced IHOs are recusing themselves from complicated cases that raise novel or complicated issues.

277.    This situation is causing IHOs to fear appeals and structure their conduct and rulings accordingly, which is harmful for parents as the SRO rules for the district in the overwhelming majority of cases.

278.   IHOs are required to render their decision within 14 days after the record close date and are only paid a small flat fee for decisions. They now fear sanctions and reprisals by the SRO and NYSED if they are late, even if they obtain consent of the parties.

279.   The SRO's decisions are required to be issued within 30 days, but are now extremely delayed, despite the fact that the SRO office has a full administrative staff, and a panel of NYSED employees to assist the reviewing officers.

280.   Further, the IHOs are not vested with jurisdiction over federal laws and claims, which the IDEA requires be exhausted through the administrative process.

281.   In addition to the above, the manner in which Defendants and the state have adopted payment policies for IHOs creates conflicts of interest and is inconsistent with the requirements for independence and impartiality for IHOs.

282.   Further, the IHOs and SRO are not, as Congress contemplated, "educational experts" or authorities in education; they do not have more knowledge and/or expertise than a federal judge. They are mostly lawyers with no particularized training other than the training that is provided on occasion by NYSED.

## CAUSES OF ACTION

283.   Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

284.   Defendants have violated Y.T.'s stay-put rights.

285.   Defendants have violated all Plaintiffs' rights under the IDEA by: (a) denying Y.T. a FAPE under the IDEA for all of the school years in question; (b) denying Y.T. the opportunity for educational benefit; and (c) substantially excluding Y.T.'s parents from the special education process.

286.   Defendants have violated Plaintiffs' procedural and due process rights under the IDEA.

287.   Defendants violated Plaintiffs' rights under the IDEA, Section 504, and New York State Education law by failing to evaluate and reevaluate Y.T. in accordance with those laws.

288.   Defendants improperly pre-determined the outcomes of Y.T.'s IEP meetings.

289.    Defendants are violating Y.T.'s stay-put rights by terminating his 1:1 ABA services.

290.    Defendants have violated Plaintiffs' procedural rights under the IDEA by failing to provide translation and interpretation services as required by the statute and regulations, as well as state regulations concerning special education.

291.    Defendants violated Plaintiffs' rights under 42 U.S.C. § 1983 by failing to have adequate policies, procedures, protocols, and training to ensure that the long-standing provisions of the federal special education laws were being implemented, which caused Y.T. to be deprived of the right to education afforded him under state and federal law as a result.

292.    Under color of state law, Defendants denied Y.T. his right to educational services without due process of law in violation of the Fourteenth Amendment of the U.S. Constitution by failing to provide Plaintiffs with appropriate notice of their language access and due process rights.

293.    Defendants have failed to both (a) adopt policies, procedures, protocols and (b) supervise their staff to ensure that Parents whose native language is not English, such as Plaintiffs, receive legally sufficient education-related documents in English and translated into their native language as required by the IDEA, New York State Education law, and regulations promulgated by the Commissioner of Education.

294.    Defendants have failed to both (a) adopt policies, procedures, protocols and (b) supervise their staff to ensure that Defendants undertake sufficient efforts to explain the special education and IEP process to Parents whose native language is not English.

295.    Defendants have failed to both (a) adopt policies, procedures, protocols and (b) supervise their staff to ensure that Parents whose native language is not English, such as Plaintiffs, receive legally sufficient education-related documents in English and translated into their native language as required by Section 504.

296.    Defendants have failed to both (a) adopt policies, procedures, protocols and (b) supervise their staff to ensure that Parents whose native language is not English, such as Plaintiffs, receive interpreters at education-related meetings.

297.    Defendants discriminated and are discriminating against Y.T. based on his disability pursuant to Section 504 of the Rehabilitation Act by adopting, implementing, and subjecting him to blanket policies and practices with respect the development of his IEP and placement.

298.    Defendants have discriminated and are discriminating against Y.T. based on his disability pursuant to Section 504 of the Rehabilitation Act by failing to provide him accommodations and supports he needs to gain equal access to state-created education, such as services he requires in order to learn and to generalize his skills.

299.    Defendants' conduct has been gross, reckless, and intentional.

300.    Defendants have violated the rights of the Plaintiffs under New York State Education Law §§ 3202, 3203, 4401, 4404 and 4410 and § 200 of the Regulations of the New York State Commissioner of Education, 8 N.Y. COMP. CODES R. REGS. § 200.

## RELIEF

WHEREFORE, Plaintiffs request that the Court:

    a.  Issue a TRO enjoining Defendants:

        i.  From terminating the funding for Y.T.'s 20 hours per week of 1:1 ABA services and parent training with an interpreter and BCBA supervision;

    b.  Issue a Preliminary Injunction;

        i.  Enjoining Defendants from terminating the funding for Y.T.'s 20 hours per week of 1:1 ABA services and parent training with an interpreter and BCBA supervision;

        ii.  Directing Defendants to provide five hours per week of speech and language therapy to Y.T.;

        iii.  Directing Defendants to provide  Y.T.– through direct provision of services using qualified and trained teachers or by funding private providers – a full day program of 1:1 instruction using research-based instructional strategies, including ABA; such program should be

supervised by a BCBA and coordinated with any home-based program. If transportation is necessary to this program, Defendants should provide it;

iv. Directing Defendants to provide Y.T. with augmentative communication software and instruction to Y.T. in how to use the program;

v. Directing Defendants to fund an independent AT evaluation and FBA;

vi. Directing the Defendants to fund an observation that will enable the Court to obtain an objective picture of Y.T.'s skills across different environments and instructors. The Defendants should fund independent teachers experienced in ABA and working with children with autism, like Y.T., who are not employed by or otherwise beholden to the Defendants to conduct the observation over a period of at least three weeks, in school and at home.  Plaintiffs and Defendants should agree upon the individuals to conduct this observation; these individuals should videotape him and take data and notes with the purpose of clarifying the extent of his skills and the benchmark for each skill between environments and instructors. Those instructional experts should be accessible to both parties, but should report to the Court;

vii. Following the observation period and after expedited discovery, the Court shall conduct a hearing render a decision with respect to the preliminary relief requested herein;

viii. Directing Defendants to translate all of the evaluations, progress reports and IEPs (to the extent progress is noted in those documents) for all of the years in question and on a going forward basis, so that the Plaintiffs can participate in the special education process.

c. Issue a Permanent Injunction and Order

i. Enjoining Defendants from applying the blanket policies and procedures asserted herein with respect to Y.T.;

ii. Reversing the portions of the IH Decision pursuant to which Plaintiffs were aggrieved;

iii. Ordering the relief requested as part of the preliminary injunction to the extent that it is still appropriate;

iv. Directing Defendants to develop an IEP that complies with all of the procedural aspects of the IDEA and which includes: 1:1 instruction in a full day ABA program; 25 hours per week of 1:1 ABA services; supervision by a BCBA; parent training at home with an interpreter; five hours per week of SLT; OT in a sensory gym; and appropriate AT, including an appropriate augmentative communication device;

v. Directing Defendants to hire a readability consultant to revise their due process forms and safeguards and to then so revise their forms;

vi. Directing Defendants to comply with the PWN mandates of the IDEA;

vii. Granting compensatory education and equitable relief in the form of special and general educational services to make up for the failure to provide a FAPE to Y.T. for each year in question. The compensatory education should include but not be limited to: (a) prospective funding for Y.T. to attend a private school that provides intensive 1:1 ABA therapy; (b) payment for additional intensive speech and language therapy; (c) 1:1 ABA services at home; (d) parent training at home; (e) any other services that are necessary to compensate for the failures set forth herein;

viii. Declaring that the actions, policies, procedures, and protocols as alleged herein violate the applicable laws, as alleged herein;

ix. Ordering damages under the applicable statutes;

    d.  Award Plaintiffs their costs and attorneys fees; and

    e.  Grant such other and further relief as may be appropriate.

Dated:    July 3, 2013

          New York, New York


Respectfully submitted,

FRIEDMAN & MOSES, LLP


By _____
Elisa Hyman, Esq. (EH4709)
Of Counsel
Attorneys for the Plaintiffs
233 Broadway, Suite 901
New York, NY 10279
Ph: 646-572-9064
F: 646-572-9065
Email: EH@friedmanandmoses.com

43