UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

M.G. and V.M., on behalf of themselves
individually and their child, Y.T.; M.W., on
behalf of herself individually and her son,
E.H.; A.D., on behalf of herself individually
and as next friend of her son, D.D.; N.S., on
behalf of himself individually and as next
friend on behalf of his child, K.S.; E.H.1, on
behalf of herself individually and as next
friend on behalf of her child, E.H.2; E.E.G.,
on behalf of herself individually and as next
friend on behalf of her son, Y.A.; A.G., on
behalf of herself individually and as next
friend on behalf of her sons, S.B. and K.B.;
individually and on behalf of others similarly
situated,

Plaintiffs,

- against -

NEW YORK CITY DEPARTMENT OF
EDUCATION; NEW YORK CITY BOARD
OF EDUCATION; CARMEN FARIÑA, in
her official capacity as Chancellor of the New
York City School District; NEW YORK
STATE EDUCATION DEPARTMENT;
COMMISSIONER MARYELLEN ELIA, in
her official capacity as Commissioner of the
New York State Education Department,

Defendants.

------------------------------------------------------------- X

**OPINION AND ORDER**

**13-cv-4639 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/4/16

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.      INTRODUCTION

This suit — against the New York City Department of Education ("DOE") and its Chancellor, Carmen Fariña (collectively, the "City Defendants") and the New York State Education Department ("NYSED") and its Commissioner, MaryEllen Elia[1] (collectively, the "State Defendants") (together with the City Defendants, "defendants") — is brought by the parents of eight New York City students who are classified as autistic under the Individuals with Disabilities Education Act ("IDEA")[2] and have individualized education programs ("IEPs") pursuant to the IDEA.[3]  Plaintiffs allege that the City and State defendants have adopted certain systemic policies which impede the provision of adequate special education services to New York City students, in violation of federal and state law. Plaintiffs assert violations of the IDEA,[4] Section 504 of the Rehabilitation Act of

---

[1]      As of July 6, 2015, MaryEllen Elia replaced John B. King as NYSED Commissioner.

[2]      *See* 20 U.S.C. § 1400, *et seq.  See also* 34 C.F.R. § 300.8(c)(1) (defining autism under the IDEA as "a developmental disability significantly affecting verbal and nonverbal communication and social interaction . . . that adversely affects a child's educational performance").

[3]      *See* 20 U.S.C. § 1414.

[4]      *See id.* § 1400, *et seq.*

2

1973 ("Section 504"),[5] Section 1983 of Title 42 of the United States Code

("Section 1983"), the Due Process Clause of the Fourteenth Amendment, the New

York State Constitution, and sections of the New York State Education Law.

          In the instant motion, plaintiffs seek class certification of two classes

and three subclasses under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil

Procedure.  *First*, plaintiffs seek to certify an "NPS Class," comprised of students

who have been recommended for placement in a State-approved non-public school

("NPS" or "NPS Program") and are subject to an alleged State-issued directive (the

"NPS Directive") that these schools provide all services set forth on a student's

IEP within the instructional day.  Within the NPS Class, plaintiffs seek

certification of two subclasses:  the "Due Process NPS Subclass" and the "Lost

Services NPS Subclass."  *Second*, plaintiffs seek to certify an "Autism Services

Class," comprised of autistic students who are allegedly subject to a City policy of

refusing to recommend certain educational services to which plaintiffs are entitled

(the "Autism Services Policies and Practices").  Within the Autism Services Class,

plaintiffs also seek to certify the "Due Process Autism Subclass."[6]  Additionally,

---

[5]     *See* 29 U.S.C. § 794.

[6]     Plaintiffs state that they may later seek certification of a "Due Process
Violations Class," explaining that, at present, defendants "ha[ve] reduced delays
that were part of the impetus for the claims originally raised on behalf of [this]
putative . . . Class."  *See* Plaintiffs' Memorandum of Law in Support of Class

plaintiffs seek appointment as class representatives and approval of their attorneys as class counsel.

For the following reasons, plaintiffs' motion is GRANTED in part and DENIED in part. Class certification is (1) granted in full for the NPS Class and Due Process NPS Subclass; (2) denied for the Lost Services NPS Subclass; (3) and granted, as modified herein, for the Autism Services Class and Due Process Autism Subclass. For the surviving classes and subclasses, plaintiffs' request for appointment as class representatives and approval of class counsel is granted.

## II.    BACKGROUND[7]

### A.    Procedural History

In July 2013, student Y.G. and his parents, M.G. and V.M., initiated this suit against the City Defendants only. Subsequently, seven additional students and their parents joined as plaintiffs and claims against the State Defendants were added. Class allegations were first asserted in the Third Amended Complaint, which was filed in May 2014.[8] On August 28, 2015, plaintiffs moved for

Certification ("Pl. Mem.") at 2 n.3.

[7]    This Opinion outlines only the background relevant to deciding this motion.

[8]    At present, the operative pleading is the Fourth Amended Complaint ("FAC"), filed on June 18, 2015.

certification of two classes and three subclasses, appointment as class representatives, and approval of class counsel.[9]  The proposed classes and subclasses are defined as follows:

### 1.    Proposed NPS Class and Subclasses

Plaintiffs D.D., K.S., Y.A., and E.H. seek to certify and represent the "NPS Class" of all

> (i) children with disabilities under the meaning of the IDEA who (a) reside in New York City; (b) have IEPs; (c) were recommended for or attended an "NPS Program" and (d) have been subject to the NPS Directive and (ii) those who will, in the future, meet the criteria of (i).[10]

Additionally, plaintiffs seek to certify two subclasses of the NPS Class.  *First*, all proposed NPS Class representatives seek to certify the "Due Process NPS Subclass," consisting of:  "(i) members of the NPS Class who are, or were, receiving and will receive [Related] NPS Services; and (ii) who invoked or will invoke their due process [rights] and obtained stay-put rights under 20 U.S.C. § 1415(j)."[11]  *Second*, plaintiffs D.D., K.S., and Y.A. seek to certify and represent the "Lost Services NPS Subclass," consisting of individuals who "(i) are members of the NPS Class whose [Related] NPS

---

[9]    The State and City Defendants filed separate briefs in opposition to class certification.

[10]    Pl. Mem. at 25.

[11]    *Id.*  "Related Services" are discussed *infra* at Part II(B)(1).

5

Services were removed from their IEPs; and (ii) all those who will, in the future, meet the criteria of (i)."[12]

### 2.    Proposed Autism Services Class and Subclass

All eight students bringing this action also seek to certify and represent the "Autism Services Class" and "Due Process Autism Subclass."  The Autism Services Class consists of all

> (i) children diagnosed with Autism Spectrum Disorder . . . under the [Diagnostic and Statistical Manual of Mental Disorders], or classified as autistic by the City Defendants under the IDEA, who (a) reside in New York City; (b) have IEPs; (c) have been subject to the Defendants' Autism Services Policies and Practices; and (ii) those who will, in the future, meet the criteria of (i).[13]

The Due Process Autism Subclass consists of "members of the Autism Services Class who have won or will win [Impartial Hearing Officer ("IHO")] or [State Review Officer ("SRO")] decisions, court orders, or entered into resolution agreements for Autism Services and who have been or will be subject to the Autism Services Policies and Practices."[14]

---

[12]    Pl. Mem. at 25.

[13]    *Id.* at 36.

[14]    *Id.* at 36-37.

**B.     The IDEA**[15]

The IDEA is a federal statute regulating the education of children with disabilities.[16]  In exchange for federal funding, the IDEA requires participating states to provide disabled children with a free and appropriate public education ("FAPE") and offer them and their parents certain procedural protections.[17]

State and local educational agencies share the responsibility of complying with the IDEA.[18]  State Defendants are responsible for the "general supervision" of special education, including the development of IDEA-compliant policies and procedures.[19]  In carrying out these obligations, the State cannot "use a funding mechanism by which the State distributes funds on the basis of the type of setting in which a child is served that will result in the failure to provide a child with a disability FAPE according to the needs of the child."[20]  Further, City Defendants are responsible for implementing "policies, procedures, and programs

---

[15]     Although plaintiffs also allege violations of other federal and state education laws, the IDEA is the relevant statutory scheme for the issues raised by the instant motion.

[16]     *See* 20 U.S.C. § 1400, *et seq.*

[17]     *See id.* § 1400(d)(1).

[18]     *See id.* §§ 1412, 1413.

[19]     *Id.* § 1412(a)(11).

[20]     *Id.* § 1412(a)(5)(B)(i).

that are consistent with the State policies and procedures."[21]

### 1.    FAPE and Related Services

A FAPE requires satisfying each student's "unique needs and prepar[ing] them for further education, employment, and independent living."[22]  To achieve this, the IDEA requires that each disabled student have a written IEP in place — developed with input from parents, evaluators, and teachers — and that this IEP is revised at least annually.[23]  The IEP must contain, *inter alia*, "a statement of the special education and related services and supplementary aids and services . . . to be provided to the child, . . . and a statement of the program modifications or supports for school personnel that will be provided for the child."[24]

"Related [S]ervices . . . are such developmental, corrective, and other supported services . . . as may be required to assist a child with disability to benefit from special education."[25]  Depending on a child's needs, his or her "Related Services" may include "speech-language pathology, audiology services,

---

[21]    *Id.* § 1413(a)(1), (e)(3).

[22]    *Id.* § 1400(d)(1).

[23]    *See id.* § 1414(a)(1)(A), (d)(1)(A)(i)(IV), (d)(4)(A).

[24]    *Id.* § 1414(d)(1)(A)(i)(IV).

[25]    *Id.* § 1401(26)(A).

8

interpreting services, psychological services, physical therapy, occupational

therapy, rehabilitation counseling services, parent counseling and training, and

assistive technology services."[26]  If a local school district is unable to provide the

Related Services required by a child's IEP, parents can apply for a Related

Services Authorization ("RSA"), which is "essentially a voucher for . . . parents to

find an appropriately licensed credentialed provider to provide the [R]elated

[S]ervices."[27]

### 2. NPS

The IDEA also permits school districts to place disabled children in

NPS Programs instead of public schools.[28]  New York law offers four types of NPS

for school-age children:  (1) "private 853 schools" run by private agencies; (2)

"Special Act School Districts" for "students who reside in child care institutions";

(3) privately-operated "State-supported schools"; and (4) "State-operated schools"

---

[26]     9/30/15 Declaration of James P. DeLorenzo, Assistant Commissioner for Special Education, NYSED ("DeLorenzo Decl.") ¶ 6.  *Accord* 20 U.S.C. § 1401.

[27]     7/27/14 Deposition of Dr. Steve Albert, Executive Director of Program and Regulatory Affairs, New York City DOE ("7/27/14 Albert Dep."), Ex. C to 7/25/15 Declaration of Plaintiffs' Attorney, Elisa Hyman ("Hyman Decl."), at 240:21-24.  *Accord* DeLorenzo Decl. ¶ 11.

[28]     *See* 20 U.S.C. § 1412(10)(B)(ii).  Section 504 contains a similar provision.  *See* 34 C.F.R. § 300.146.

9

for visually- and hearing-impaired students.[29]  Children attending NPS are nonetheless entitled to "all the rights [they] would have if" attending a public school,[30] and defendants remain responsible for providing a FAPE to NPS students in their jurisdiction.[31]

### 3. Procedural Rights Under the IDEA

The procedural rights guaranteed by the IDEA include the right of parents to an impartial due process hearing regarding their child's placement and services.[32]  In general, children are entitled to remain in their "then-current educational placement" during the pendency of these proceedings.[33]

In New York state, the initial due process hearing is conducted before an IHO from the local educational agency.[34]  The IHO's written decision is appealable to the New York State Education Department's Office of State Review,

---

[29]     NYSED, *Approved Private, Special Act, State-Operated and State-Supported Schools in New York State*, http://www.p12.nysed.gov/specialed/privateschools/home.html.

[30]     20 U.S.C. § 1412(10)(B)(ii).

[31]     *See id.*; 34 C.F.R. § 300.146.

[32]     *See* 20 U.S.C. § 1415(f).

[33]     *Id.* § 1415(j).

[34]     *See* N.Y. Educ. Law § 4404(1).

where an SRO will examine the record and issue an "independent decision."[35]

After exhausting this two-tiered administrative review process, an aggrieved party

is entitled to seek judicial review in federal or state court.[36]

### C.    The Alleged NPS Directive

Plaintiffs allege that on July 2, 2012, the State Defendants issued a

directive, by letter, stating that NPS students "would no longer be able to receive

special education and related services unless those services were offered by or

available directly through the particular NPS Program the child was or would be

attending" (the "NPS Directive").[37]   Defendants contend that the reason for this

---

[35]      20 U.S.C. § 1415(g).

[36]      *See id.* § 1415(i)(2)(A).

[37]      Pl. Mem. at 19-20.  *Accord* 7/2/12 Letter from Belinda Johnson,
NYSED, to Ellenmorris Tiegerman, Schools for Language and Communication
("7/2/12 NYSED Letter"), Ex. B to DeLorenzo Decl., at 1 ("I am writing to remind
New York State-approved 853 school-age providers that all [R]elated [S]ervices
for students enrolled in such schools are to be provided within the school's
educational program in accordance with the . . . [IEP]-recommended special
education program and services for which the school has been approved. . . . A
New York State-approved 853 school-age provider should not be offering
admission to any student for whom it cannot provide the special education program
and services recommended on the student's IEP, including [R]elated [S]ervices
within the school day.  If there are students currently enrolled in your school with
IEP recommendations for services that your program is not providing, you must
either begin to provide all mandated services or make an immediate referral to the
Committee on Special Education (CSE). . . . This will enable the CSE to identify
an appropriate educational placement for affected students currently enrolled in
your program.").

policy change was "that many [NPS] serving disabled children in New York City were relying on RSAs to provide [R]elated [S]ervices to students enrolled in their programs, in tension with the state education regulations."[38]  Defendants also maintain that the shift toward requiring in-school Related Services was intended to benefit students and reduce out-of-school burdens on parents.[39]  In contrast, plaintiffs allege that the impetus for this directive was that City Defendants "were funding Additional [Related] Services . . . deemed [by State Defendants] to be in excess of the pre-approved funding . . . allocated to each NPS Program."[40]

On July 27, 2012, the State Defendants issued another letter "clarify[ing]" that NPS "should accept only those students for whom the school could provide all the special education and [R]elated [S]ervices set forth on the student's IEP, during the course of a school day, and without the need for the issuance of RSAs."[41]  The July 27, 2012 letter also stated that "students currently

---

[38]     State Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification ("State Def. Opp.") at 7.  *Accord* DeLorenzo Decl. ¶¶ 12-13, 19.

[39]     *See* 7/27/14 Albert Dep. at 83:18-84:22; 11/20/15 Deposition of James P. DeLorenzo (11/20/15 DeLorenzo Dep.), Ex. D to 12/2/15 Declaration of William J. Taylor, Assistant Attorney General, at 78:15-81:21, 85:20-87:19.

[40]     Pl. Mem. at 20-21.

[41]     7/27/12 Letter from James P. DeLorenzo, NYSED, to Corinne Rell-Anselmi, New York City DOE ("7/27/12 NYSED Letter"), Ex. A to DeLorenzo

receiving [R]elated [S]ervices through an RSA need to continue to have the services provided until school-based services are available or an alternative school program has been identified."[42]  A State employee later testified that "the directive[] is related to [R]elated [S]ervices."[43]

Plaintiffs allege that in promulgating and carrying out the NPS Directive,

> State Defendants . . . (i) are foreclosing the possibility that severely disabled children can receive individualized special education; (ii) caused a large number of children with varying disabilities to lose a variety of services; (iii) are preventing [Related] Services without litigation; and (iv) have usurped the authority of the IEP teams in New York City.[44]

As a result, plaintiffs contend, parents of disabled children attending NPS and requiring Related Services have been forced to choose between foregoing necessary services that cannot be provided by their NPS, forfeiting their child's NPS placement, or initiating a due process hearing in hopes of being awarded the

----

Decl., at 1.  *Accord* DeLorenzo Decl. ¶ 20; State Def. Opp. at 8-9.

[42]    7/27/12 NYSED Letter at 1.

[43]    6/17/14 Deposition of Belinda Ann Johnson, New York City Regional Coordinator for the NYSED ("6/17/14 Johnson Dep."), Ex. B to Hyman Decl., at 177:10-19.

[44]    Plaintiffs' Reply Memorandum in Response to the Opposition of the State Defendants at 2.

Related Services that they otherwise would lose.

State Defendants explain, however, that where circumstances prevent NPS from providing certain Related Services, the State can issue student-specific RSA exceptions.[45]  State Defendants assert that "every such request that has been made has been approved" but note that "[t]hese circumstances usually involve very specialized needs for [R]elated [S]ervices."[46]  Accordingly, "with very few exceptions, . . . [R]elated [S]ervices are no [longer] being provided through RSAs for [NPS] students."[47]  During the 2013-2014 school year, NYSED received "approximately six" petitions for an RSA exception.[48]

**E.    The Alleged Autism Services Policies and Practices**

Separately, plaintiffs allege that the City Defendants have implemented certain Autism Services Policies and Practices that impermissibly impede consideration of "the full range of education services, supports, and accommodations . . . contemplated by IDEA."[49]  Plaintiffs define the Autism Services Policies and Practices as, "[i]n essence, Defendants['] restrictions on the

---

[45]     *See* DeLorenzo Decl. ¶ 25; 11/20/15 DeLorenzo Dep. at 99:9-102:20.

[46]     DeLorenzo Decl. ¶ 25.

[47]     *Id.* ¶ 26.

[48]     6/17/14 Johnson Dep. at 175:16-18.

[49]     FAC ¶ 80.

14

ability of IEP Teams to recommend Autism Services (defined below) on an autistic child's IEP."[50]  Plaintiffs allege that because of these Autism Services Policies and Practices, the IEP process is "improperly influenced by blanket policies, as well as limitations on services,"[51] subjecting autistic students to "non-individualized and de-facto restricted IEP meetings"[52] and forcing them to file for due process hearings to secure certain accommodations that they require (the "Autism Services").[53]  These Autism Services are defined in the Fourth Amended Complaint as:

> (a) 1:1 instruction with a teacher for all or part of the day; (b) research-based instructional strategies, including, but not limited to, Applied Behavioral Analysis ("ABA"); (c) extended school day, after school or home-based services (for students attending a school-day program); (d) parent training at home; (e) services to promote inclusion; (f) training for staff; (g) rehabilitation training; (h) leisure training; or (i) instruction in a ratio smaller than 6:1:1 for students in a public school.[54]

Plaintiffs further allege that even when Autism Services *are* awarded through due

---

[50]     *Id.* ¶ 78.

[51]     Pl. Mem. at 34.

[52]     *Id.* at 38.

[53]     *See* FAC ¶ 88.

[54]     *Id.* ¶ 79.  ABA is "an intensive one-on-one therapy that involves breaking down activities into discrete tasks and rewarding a child's accomplishments."  *E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 446 (2d Cir. 2014).

process hearings, defendants have a policy of terminating such services at the end of each school year — requiring parents to continually re-litigate their child's entitlement to these services.[55]

During depositions, a State employee confirmed that children should receive all special education services within the school day[56] and stated that one-to-one instruction cannot be designated on IEPs.[57]  Additionally, State and City employees testified that IEP teams cannot include ABA services on an IEP.[58] Plaintiffs allege that defendants made similar representations regarding ABA to parents during IEP meetings and due process hearings.[59]

All plaintiffs filed due process challenges with respect to their IEP

---

[55]     *See* FAC ¶¶ 84, 86.

[56]     *See* 6/17/14 Johnson Dep. at 85:21-24; Pl. Mem. at 35.

[57]     *See* 6/17/14 Johnson Dep. at 195:19-25; Pl. Mem. at 35.

[58]     *See* 10/8/14 Supplementary Deposition of Belinda Ann Johnson, New York City Regional Coordinator for the NYSED ("10/8/14 Johnson Dep."), Ex. B to Hyman Decl., at 476:7-10 ("In general, it is my understanding ABA, as an instructional methodology, is not to be designated on the IEP at all.").  *See also* 6/30/14 Deposition of Claire Donnellan, Deputy Executive Director for the Committees on Special Education, New York City DOE ("6/30/14 Donnellan Dep."), Ex. A to Hyman Decl., at 204:3, 206:16, 289:10-290:11; 6/17/14 Johnson Dep. at 196:16-19; Pl. Mem. at 35.

[59]     *See, e.g.*, S.B. Due Process Complaint, Ex. D to 10/26/15 Reply Declaration of Plaintiffs' Attorney, Elisa Hyman ("Hyman Reply Decl."), at 2-3; E.H. Impartial Hearing Request, Ex. F to Hyman Reply Decl., at 5.

16

services,[60] and all have been awarded ABA and other requested services through these proceedings.[61]  At least some plaintiffs have repeatedly filed such challenges over successive school years.[62]

## III.   LEGAL STANDARD

### A.   Federal Rule of Civil Procedure 23(a)

Rule 23(a) permits individuals to sue as representatives of an aggrieved class.  To be certified, a putative class must first meet all four prerequisites set forth in Rule 23(a), generally referred to as numerosity, commonality, typicality, and adequacy.[63]  District courts have broad discretion in

---

[60]     *See* Pl. Mem. at 35.  *See also* Exs. A-H to Hyman Reply Decl. (records from plaintiffs' administrative hearings).

[61]     *See, e.g.*, S.B. Hearing Officer's 8/21/15 Order on Pendency, Ex. D to Hyman Reply Decl., at 43; Y.A. Hearing Officer's 8/13/15 Order on Pendency, Ex. B to Hyman Reply Decl., at 20.  *See also* Pl. Mem. at 36.

[62]     *See* Exs. A-H to Hyman Reply Decl.

[63]     *See Sykes v. Mel. S. Harris & Assocs. LLC*, 780 F.3d 70, 80 (2d Cir. 2015).  In full, Rule 23(a) reads:

> Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

17

deciding whether to certify a proposed class under Rule 23.[64]

"Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate [its] compliance with the Rule — that is, [it] must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."[65]  Plaintiffs seeking class certification bear the burden of demonstrating by a preponderance of the evidence that the proposed class meets each of the requirements set forth in Rule 23(a).[66]  When assessing whether plaintiffs have met this burden, courts must take into account "all of the relevant evidence admitted at the class certification stage."[67]  A court may certify a class only after determining that "whatever underlying facts are relevant to a particular Rule 23 requirement have been established."[68]  This rigorous analysis requires examining the facts of the dispute, not merely the pleadings, and it will frequently "entail some overlap with the merits of the

---

[64]     *See Parker v. Time Warner Entm't Co. L.P.*, 331 F.3d 13, 28 (2d Cir. 2003).

[65]     *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011) (emphasis in original).

[66]     *See New Jersey Carpenters Health Fund v. Rali Series 2006-Q01 Trust*, 477 Fed. App'x 809, 812 (2d Cir. 2012).

[67]     *In re IPO Secs. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006).

[68]     *Id.* at 41.

plaintiff's underlying claim."[69]

However, "[a] motion for class certification should not . . . become a mini-trial on the merits.'"[70]  At the class certification stage, "a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement."[71]  Further, the court's "determination as to a Rule 23 requirement is made only for purposes of class certification and is not binding on the trier of facts, even if that trier is the class certification judge."[72]

Additionally, "'[e]ven after a certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation.'"[73] "In fact, the court has a duty to ensure that the class is properly constituted and has broad discretion to modify the class definition as appropriate to provide the

---

[69]    *Wal-Mart*, 131 S.Ct. at 2551.  "Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, *e.g.*, jurisdiction and venue, is a familiar feature of litigation."  *Id.* at 2552.

[70]    *Flores v. Anjost Corp.*, 284 F.R.D. 112, 122 (S.D.N.Y. 2012).

[71]    *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 251 (2d Cir. 2011) (quotation marks and citation omitted).  Courts must ensure "that a class certification motion does not become a pretext for a partial trial of the merits."  *In re IPO*, 471 F.3d at 41.

[72]    *In re IPO*, 471 F.3d at 41.

[73]    *Easterling v. Connecticut Dep't of Corr.*, 278 F.R.D. 41, 45 (D. Conn. 2011) (quoting *General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).

necessary precision."[74]

### 1.    Numerosity

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable."  In the Second Circuit, sufficient numerosity can be presumed at a level of forty members or more.[75]  "The numerosity requirement in Rule 23(a)(1) does not mandate that joinder of all parties be impossible — only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate."[76]  Courts do not require evidence of exact class size to satisfy the numerosity requirement.[77]

### 2.    Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common

---

[74]    *Morangelli v. Chemed Corp.*, 275 F.R.D. 99, 114 (E.D.N.Y. 2011) (quoting 5 James W. Moore, *Moore's Federal Practice* § 23(6)) (modifying class definition to exclude certain claims for which Rule 23(b)(3) predominance was not established).  *Accord Brooklyn Ctr. for Independence of the Disabled v. Bloomberg*, 290 F.R.D. 409, 420 (S.D.N.Y. 2012).

[75]    *See Pennsylvania Pub. Sch. Emps. Ret. Sys. v. Morgan Stanley & Co., Inc.*, 772 F.3d 111, 116 (2d Cir. 2014) (citing *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)).

[76]    *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 244–45 (2d Cir. 2007).

[77]    *See Kaplan v. S.A.C. Capital* Advisors, No. 13 Civ. 2459, 2015 WL 8593478, at *3 (S.D.N.Y. Dec. 2, 2015) (citing *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993)).

to the class."  Commonality thus requires plaintiffs "to demonstrate that the class members 'have suffered the same injury.'"[78]  Commonality further requires that the claims asserted "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[79]

### 3.    Typicality

Under Rule 23(a)(3), "[t]ypicality 'requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events[] and each class member makes similar legal arguments to prove the defendant's liability.'"[80]  The typicality requirement may be satisfied where "'injuries derive from a unitary course of conduct by a single system.'"[81]  Accordingly, "[t]he commonality and typicality requirements tend to merge into one another, so that similar considerations animate

---

[78]    *Wal-Mart*, 131 S.Ct. at 2551 (quoting *General Tel. Co.*, 457 U.S. at 157).

[79]    *Id.*

[80]    *Central States*, 504 F.3d at 245 (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)).

[81]    *In re Smith Barney Transfer Agent Litig*, 290 F.R.D. 42, 46 (S.D.N.Y. 2013) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)).

analysis of Rule 23(a)(2) and (3)."[82]

The purpose of typicality is to ensure that class representatives "have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions."[83]  A lack of typicality may be found in cases where the named plaintiff "was not harmed by the [conduct] he alleges to have injured the class"[84] or the named plaintiff's claim is subject to "specific factual defenses" atypical of the class.[85]

### 4.    Adequacy

Adequacy under Rule 23(a)(4) "is twofold:  the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members."[86] Thus, the question of adequacy "entails inquiry as to whether: 1) plaintiffs'

---

[82]    *Marisol A.*, 126 F.3d at 376.

[83]    *Vivaldo v. United Talmudical Acad. of Kiryas Joel, Inc.*, No. 14 Civ. 2636, 2015 WL 4922961, at *5 (S.D.N.Y. June 18, 2015) (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 510 (S.D.N.Y. 1996)).

[84]    *Ligon v. City of New* York, 288 F.R.D. 72, 79 (S.D.N.Y. 2013) (quoting *Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 64 (S.D.N.Y. 2006)).

[85]    *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006).

[86]    *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).

interests are antagonistic to the interest of other members of the class and 2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation."[87] In order to defeat a motion for certification, any conflicts between the class representative and members of the putative class must be "fundamental."[88]

### 5.   Implied Requirement of Ascertainability

Finally, in addition to the express requirements of Rule 23(a), the Second Circuit recognizes an "implied requirement of ascertainability."[89]  "[T]he touchstone of ascertainability is whether the class is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'"[90]  Accordingly, "[a] class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case."[91]  "The Second Circuit has cautioned against certifying overbroad classes, even under Rule

---

[87]    *In re Flag Telecom Holdings*, *Ltd. Secs. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)).

[88]    *Id.*

[89]    *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (citations omitted).

[90]    *Id.* (quoting 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1760 (3d ed. 1998)).

[91]    *Id.* at 24-25 (quotation marks and citation omitted).

23(b)(2), which requires a less precise definition than Rule 23(b)(3)."[92]

## B.      Federal Rule of Civil Procedure 23(b)(2)

If the requirements of Rule 23(a) are met, the court "must next determine whether the class can be maintained under any one of the three subdivisions of Rule 23(b)."[93]  Rule 23(b)(2) provides that an action may be maintained as a class action when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  The Supreme Court "has clarified that certification of a class for injunctive relief is only appropriate where 'a single injunction . . . would provide relief to each member of the class.'"[94]  Additionally, "[i]t is appropriate for the court to consider the 'inability of the poor or uninformed to enforce their rights and the improbability that large numbers of class members would possess the initiative

---

[92]     *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 228 (S.D.N.Y. 2010) (citing *Haitian Ctrs. Council, Inc. v. McNary*, 969 F.2d 1326, 1337-38 (2d Cir. 1992) (further citations omitted)).

[93]     *McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 222 (2d Cir. 2008).

[94]     *Sykes*, 780 F.3d at 80 (quoting *Wal-Mart*, 131 S.Ct. at 2557).

to litigate individually.'"[95]

## C.  Federal Rule of Civil Procedure 23(c)(5)

Rule 23(c)(5) authorizes the creation of subclasses "that are each treated as a class."  When "exercising its discretion to certify subclasses," however, "a court must assure itself that each subclass independently meets the requirements of Rule 23."[96]

## IV.  DISCUSSION

### A.  Rule 23(a)

#### 1.  Proposed NPS Class and Subclasses

As discussed below, the proposed NPS Class and Due Process NPS Subclass fulfill Rule 23(a)'s requirements, but the proposed Lost Services NPS Subclass fails for lack of ascertainability.

##### a.  Numerosity

Rule 23(a)(1) requires that the "class [be] so numerous that joinder of all members is impracticable."  Here, numerosity is not disputed and is satisfied for the NPS Class and subclasses given that each would consist of far more than forty

---

[95]     *Betances v. Fischer*, 304 F.R.D. 416, 426-27 (S.D.N.Y. 2015) (quoting *D'Alauro v. GC Servs. L.P.*, 168 F.R.D. 451, 458 (E.D.N.Y. 1996) (alteration in original) (further citation omitted)).

[96]     *Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 362 (S.D.N.Y. 2014) (citations omitted).

members.[97]  With respect to the NPS Class, defendants have represented that, as of

July 2014, there were 8,227 children with IEPs attending NPS Programs in New

York City (most of whom were placed through the City Defendants' placement

team).[98]  Additionally, with respect to the Due Process NPS Subclass, plaintiffs'

counsel represents that they have been contacted by parents of at least forty

children who fit within this subclass' definition.[99]  Lastly, with respect to the Lost

Services Subclass, the State Defendants have provided information indicating that

over one-thousand children have had their Related Services discontinued after the

issuance of the alleged NPS Directive.[100]

### b.    Commonality

Rule 23(a)(2) also requires that there be "questions of law or fact

common to the class."  The NPS Class and subclasses satisfy the commonality

requirement given that "the class members 'have suffered the same injury'" and

---

[97]     *See Consolidated Rail*, 47 F.3d at 483.

[98]     *See* 7/27/14 Albert Dep. at 57:1-22.

[99]     *See* Pl. Mem. at 26 n.1.

[100]    *See id.* at 25; *Year to Year Comparison: Contracted and RSA Related Services to Students in NPS Settings (2011-2012)*, Ex. Q to Hyman Decl.; *Year to Year Comparison: Contracted and RSA Related Services to Students in NPS Settings (2012-2013)*, Ex. R to Hyman Decl.

that their injuries are capable of class-wide resolution.[101]  All class members are

alleged to have suffered a common injury due to the existence of a single,

overarching policy:  the NPS Directive.  And as will be discussed, the record

contains sufficient evidence establishing the existence of this policy.  Further, any

injury sustained by class members as a result of the NPS Directive is capable of,

and likely best addressed by, class-wide resolution.  Here, plaintiffs' request for

relief is limited to a single injunction that would address any illegalities that are

identified in the NPS Directive.  Issuing such an injunction would not require any

individualized inquiry — including no inquiry into an individual IEP or

entitlement to money damages.

Defendants offer two main arguments against commonality, neither of

which is persuasive.[102]  *First*, relying primarily on the Supreme Court's decision in

*Wal-Mart v. Dukes*, defendants argue that plaintiffs have failed to establish the

existence of the NPS Directive and thus, that there can be no commonality without

---

[101]    *Wal-Mart*, 131 S.Ct. at 2551 (quoting *General Tel. Co.*, 457 U.S. at 157).

[102]    Although the State and City Defendants both argue against class certification of the NPS and Autism Services classes, the State Defendants' opposition brief focuses on the NPS Class whereas the City Defendants' opposition brief focuses on the Autism Services Class.  Unless otherwise noted, I will treat defendants' objections together and will not distinguish between arguments made by the State and City Defendants.

this common source of injury.[103]  The NPS Directive does not, however, present the commonality problem identified in *Wal-Mart*.  In *Wal-Mart*, plaintiffs sought to certify a nationwide class to challenge gender discrimination across the Wal-Mart chain.[104]  The Supreme Court held that the proposed nationwide class lacked commonality because there was insufficient evidence of a company-wide policy of discrimination.[105]  Instead, the Court found, Wal-Mart had a system of allowing local supervisors to make employment decisions on a discretionary basis — "just the opposite of a uniform employment practice that would provide the commonality needed for a class action."[106]  Thus, the Court observed, "[w]ithout some glue holding together the reasons for [the local supervisors'] decisions, it will be impossible to say that examination of all the class members' claims will produce a common answer."[107]

In contrast to *Wal-Mart*, the record in this case offers substantial evidence of an overarching NPS Directive regarding the provision of Related Services.  Specifically, it is undisputed that on July 2, 2012, State Defendants sent

---

[103]   *See* 131 S.Ct. at 2553.

[104]   *See id.* at 2554.

[105]   *See id.*

[106]   *Id.*

[107]   *Id.* at 2552.

letters informing NPS, *inter alia*, that "all [R]elated [S]ervices for students enrolled in such schools are to be provided within the school's education program" and that they "should not be offering admission to any student for whom it cannot provide the . . . services recommended on the student's IEP, including [R]elated [S]ervices[,] during the school day."[108]  Further, the record indicates that defendants have acted in accordance with this directive, including sending follow-up letters, reviewing applications for RSA exceptions, and determining that "with very few exceptions, . . . [R]elated [S]ervices are no [longer] being provided through RSAs for [NPS] students."[109]  Even the City Defendants' opposition brief concedes that "[p]laintiffs can credibly argue that members of [the proposed NPS Class] are all subject to the State directive."[110]

Despite this, defendants offer several inconsistent arguments challenging the existence of the NPS Directive.  In some places, defendants maintain that they have "no such policy and ha[ve] issued no such directive."[111]  As

---

[108]    7/2/12 NYSED Letter at 1.

[109]    *See, e.g.*, 7/27/12 NYSED Letter at 1; DeLorenzo Decl. ¶¶ 25-26.

[110]    City Defendants' Memorandum in Opposition to Class Certification ("City Def. Opp.") at 17.  Of course, the determination that plaintiffs have met their class certification burden of establishing the existence of the NPS Directive does not reflect any assessment of the legality of such a policy.

[111]    DeLorenzo Decl. ¶ 27.  *Accord* State Def. Opp. at 18.

explained, the record contains substantial evidence that the NPS Directive was issued and implemented.[112]  Defendants argue elsewhere that plaintiffs have mis-characterized the NPS Directive because the policy was enacted to benefit students and parents, allows for RSA exemptions, and has not prohibited NPS students from receiving Related Services when their NPS cannot provide them.[113]  These arguments not only contradict defendants' position that no such policy exists, but address the question of whether defendants violated the law (and if so, to what extent) — a merits question that is irrelevant to the commonality inquiry.[114]

Second, defendants argue that the class members' injuries are too individualized for class-wide resolution.  This argument fails because it is based on a mis-characterization of plaintiffs' claims and request for relief.  Although the IEP process is necessarily individualized to each student's needs, plaintiffs do not seek

---

[112]     Relatedly, defendants fault plaintiffs for not having submitted student or parent affidavits.  Although courts often consider such affidavits when evaluating commonality, it is unnecessary to do so here given the sufficiency of other evidence in the record (including the testimony of defendants' witnesses).

[113]     See City Def. Opp. at 16-17; State Def. Opp. at 17.

[114]     See Shahriar, 659 F.3d at 251.  Nor does the holding in Bryant v. New York State Education Department, as defendants suggest, render the NPS Directive immune to challenge.  Bryant upheld different educational regulations than those at issue here (relating to "aversive interventions" for behavioral disorders) and did not hold that all statewide policies automatically comport with the IDEA.  See 692 F.3d 202 (2d Cir. 2012).

to vindicate individual students' rights to the particular Related Service(s) they require. Rather, plaintiffs seek injunctive relief from limitations that the NPS Directive places on students' access to Related Services overall — a matter that can and should be resolved on a class-wide basis.

### c.    Typicality

Further, the NPS Class and subclasses satisfy Rule 23(a)(3)'s typicality requirement because "[e]ach class member's claim arises from the same course of events" — *i.e.*, the NPS Directive and its effect on access to Related Services — and "each class member makes similar legal arguments to prove the defendant's liability" regarding these alleged restrictions.[115]  Defendants' main arguments against typicality — that plaintiffs have failed to establish the existence of the NPS Directive and that class members require case-by-case (rather than class-wide) relief — overlap with their arguments regarding commonality. These arguments fail for the reasons explained above.

As an additional argument against typicality, defendants cite the conclusion of one class representative's IHO that "any denial of FAPE to [the

---

[115]    *Central States*, 504 F.3d at 245 (quotation marks and citation omitted).

child] . . . has in fact been remedied."[116]  However, one IHO decision — issued within a student's specific due process hearing — does not disprove the typicality of plaintiffs' claims regarding the NPS Directive as it affects all class members.  In fact, it is precisely this burden on families to file for due process hearings that plaintiffs seek to alleviate through a class-wide, systemic remedy.

### d.    Adequacy

Further, the proposed class representatives and counsel for the NPS Class and subclasses meet Rule 23(a)(4)'s requirement that they "will fairly and adequately protect the interests of the class."  The proposed class representative are children with IEPs who, as a result of the NPS Directive, have suffered the same harm alleged on behalf of each class member — namely, limitations on their access to Related Services.  Moreover, this is an action for equitable relief from such constraints on Related Services — a systemic remedy that would benefit each member of the NPS Class and subclasses (including the class representatives).  Additionally, class counsel is experienced and competent to litigate this matter, a finding that defendants do not dispute.

To contest adequacy, defendants again argue that the proposed class representatives and members have suffered differing harms because the IEP

---

[116]    State Def. Opp. at 20 (apparently referring to E.H. Hearing Officer's Interim Order, Ex. G to Hyman Reply Decl., at 9, 21).

process is too individualized for class-wide resolution.  This argument fails for the

reasons already stated.  Defendants further argue that the class representatives are

inadequate because "there are many in the proposed class for whom the [NPS

D]irective has caused no harm — either because they now receive [R]elated

[S]ervices at their school, they previously received services at their school, or they

do not require any [R]elated [S]ervice."[117]  That certain members of the proposed

classes may have a diminished interest in the outcome of this litigation does not,

however, give rise to a "fundamental" conflict between class representatives and

class members as required to defeat adequacy.[118]

### e.      Ascertainability

Although the NPS Class and subclasses satisfy the express

requirements of Rule 23(a), only the NPS Class and Due Process NPS Subclass

meet its implied requirement of ascertainability.  Accordingly, certification of the

Lost Services NPS Subclass is denied.

The NPS Class and Due Process Subclass are ascertainable

because they are based on objective, administrable criteria.  With respect to the

NPS Class, these criteria are whether:  a child resides in New York City, has an

---

[117]     City Def. Opp. at 17.

[118]     *In re Flag Telecom*, 574 F.3d at 35.

IEP, and attends or was recommended for an NPS after the alleged NPS Directive was issued.  With respect to the Due Process NPS Subclass, these criteria are whether a child receives Related Services and whether the child invokes (or will invoke) due process rights to stay at his or her NPS.  Moreover, precise ascertainability is unnecessary, as this is a Rule 23(b)(2) action and no class damages are sought.[119]

Nonetheless, defendants argue that these classes should be found unascertainable because plaintiffs have not adequately defined the terms "NPS Program," "NPS Directives," or "[Related] Services."[120]  I find, however, that plaintiffs *have* adequately defined this terminology[121] (and that defendants' own materials and testimony suggest that they too understand what these terms mean).[122]  Defendants also challenge ascertainability on the basis that the NPS

---

[119]    *See, e.g.*, *Marisol A.*, 126 F.3d at 378; *Floyd v. City of New York*, 283 F.R.D. 152, 171-72 (S.D.N.Y. 2012).

[120]    State Def. Opp. at 21-22.

[121]    *See, e.g.*, Pl. Mem. at 2-4, 7-8, 15-17, 19-22.

[122]    Defendants' materials indicate that they understand "NPS Program" to mean a "non-public school[] for children with disabilities" and "NPS Directive" to mean State Defendants' July 2, 2012 letter and subsequent conduct.  City Def. Opp. at 3.  *Accord* State Def. Opp. at 11; NYSED, *Approved Private, Special Act, State-Operated and State-Supported Schools in New York State*, http://www.p12.nysed.gov/specialed/privateschools/home.html.  Additionally, "Related Services" are defined within the IDEA and defendants' witness provided

Class and subclass definitions allow for future class members.  This argument is a red herring:  these future class members cannot, by definition, defeat ascertainability because they will be identified using the same, administrable criteria applicable to current class members.  (And, in any event, it is not necessary to identify these people in order to administer injunctive relief.)

Unlike the NPS Class and Due Process NPS Subclass, however, the proposed Lost Services NPS Subclass is unascertainable because it is over-broad.  This proposed subclass would cover all individuals who "(i) are members of the NPS Class whose [Related] NPS Services were removed from their IEPs; and (ii) all those who will, in the future, meet the criteria of (i)."[123]  Thus, by definition, this subclass would include all students whose Related Services were removed from their IEPs *for any reason.*  The explanation for this expansive subclass definition is obvious:  it would be infeasible, if not impossible, to carve out those students whose Related Services were removed for reasons unrelated to the NPS Directive (*e.g.*, because they no longer required Related Services).  Further, this subclass is likely unnecessary given that any equitable relief obtained for the NPS Class and Due Process NPS Subclass also will benefit any putative members of the

---

an explanation of this term.  *See* 20 U.S.C. § 1401(26)(A); DeLorenzo Decl. ¶ 6.

[123]    Pl. Mem. at 25.

Lost Services NPS Subclass.

### 2.    Proposed Autism Services Class and Subclass

The proposed Autism Services Class and Due Process Autism Subclass also fulfill the requirements of Rule 23(a), with a narrowed class definition as described below.

### a.    Numerosity

Rule 23(a)(1) numerosity is not disputed and is satisfied for both the Autism Services Class and subclass.  With respect to the Autism Services Class, NYSED's website indicates that, as of October 2014, over thirteen-thousand school-age students in New York City were classified as autistic.[124]  Additionally, with respect to the Due Process Autism Subclass, the New York City DOE has represented that 895 autistic students filed for due process hearings during the 2011-2012 school year.[125]

### b.    Commonality

As explained, plaintiffs seeking class certification must establish, by a

---

[124]    *See* NYSED, *School-Age Student Reports: Statewide Totals as of October 1, 2014 By Disability, County and School District*, http://www.p12.nysed.gov/sedcara/state.htm.

[125]    *See* 7/31/12 DOE FOIL Letter at 2.  This number has remained consistent since 2008, with 791, 908, and 936 autistic students filing for due process hearings during the 2008-2009, 2009-2010, and 2010-2011 school years, respectively.  *See id.*

preponderance of the credible evidence, that each of Rule 23(a)'s requirements is satisfied,[126] including Rule 23(a)(2)'s commonality requirement that "the class members 'have suffered the same injury'" and that their injuries are capable of class-wide resolution.[127]  As with the NPS Class and subclasses, defendants argue that the Autism Services Class and subclass lack commonality because plaintiffs have not adequately established that an overarching policy — here, the Autism Services Policies and Practices — binds class members' claims.[128]  Accordingly, defendants argue, plaintiffs' claims regarding their educational accommodations are too individualized to be capable of common resolution.  I find, however, that plaintiffs *have* established commonality for the Autism Services Class and subclass, subject to certain modifications of plaintiffs' proposed class definitions.

In seeking class certification, plaintiffs define Autism Services as:

(a) 1:1 instruction with a teacher for all or part of the day; (b) research-based instructional strategies, including, but not limited to, Applied Behavioral Analysis ("ABA"); (c) extended school day, after school or home-based services (for students attending

---

[126]   *See New Jersey Carpenters Health Fund*, 477 Fed. App'x at 812.

[127]   *Wal-Mart*, 131 S.Ct. at 2551 (quoting *General Tel. Co.*, 457 U.S. at 157).

[128]   Because the City Defendants conflate their arguments regarding commonality, typicality, adequacy, and ascertainability, I will discuss these arguments under the applicable Rule 23(a) prong, as necessary.  *See* City Def. Opp. at 7-14.

> a school-day program); (d) parent training at home; (e) services to
> promote inclusion; (f) training for staff; (g) rehabilitation training;
> (h) leisure training; or (i) instruction in a ratio smaller than 6:1:1
> for students in a public school.[129]

Accordingly, plaintiffs define Autism Services Policies and Practices — a term that

is incorporated into plaintiffs' definitions of the Autism Services Class and

subclass — as "defendants['] restrict[ions] on the ability of IEP Teams to

recommend [the] Autism Services . . . on an autistic child's IEP."[130]

      The class certification record does not, however, support the existence

of a blanket policy of denying *all* of these designated Autism Services at the IEP

stage.  Rather, the record indicates that certain of these services may be

systemically unavailable — namely, (a) one-to-one instruction; (b) ABA; and (c)

extended school day, after school, or home-based services.  City and State

defendants have testified that IEP teams are not permitted to recommend any of

these three types of accommodations on IEPs.[131]  Further, plaintiffs' administrative

hearing records indicate that defendants made similar representations during IEP

---

[129]    FAC ¶ 79.  *Accord* Pl. Mem. at 38.

[130]    FAC ¶ 78.

[131]    *See* 10/8/14 Johnson Dep. at 476:7-10; 6/30/14 Donnellan Dep. at 204:3, 206:16, 289:10-290:11; 6/17/14 Johnson Dep. at 85:21-24, 195:19-25, 196:16-19.

meetings and due process hearings.[132]  Thus, defendants' argument that the Autism

Services Class and subclass lack commonality because plaintiffs' claims "are

necessarily diverse, distinct, and individualized" fails with respect to one-to-one

instruction, ABA, and extended school day, after school, or home-based

services.[133]  While IEP determinations are necessarily individualized, the record

supports finding that defendants have, in fact, adopted a uniform approach with

respect to these specific Autism Services.

          By contrast, the record does not contain sufficient evidence of a

blanket policy regarding the remaining types of accommodations included in

---

[132]     *See* S.B. Due Process Complaint at 2-3; E.H. Impartial Hearing
Request at 5.

[133]     City Def. Opp. at 8.  Defendants also suggest that there can be no
policy against providing these services because NYSED "has promulgated
regulations 'to specifically ensure that students with autism services receive the
services and programs required.'"  State Def. Opp. at 24 (quoting 8 N.Y.C.R.R. §
200.13(c)).  This argument is unpersuasive, as it does not contradict the record
evidence that certain services are systemically unavailable at the IEP stage.
Moreover, that defendants' policies against designating one-to-one instruction,
ABA, or extended school day, after school, or home-based services on IEPs may
comport with educational regulations is a merits question that is not intertwined
with the commonality analysis.  Further, defendants' renewed argument that
plaintiffs have failed to meet their commonality burden because they have not
submitted affidavits, expert reports, or statistical analysis also fails because, as
discussed, there is sufficient evidence elsewhere in the record regarding restrictions
on including certain services on IEPs.  *See id.* at 23.

plaintiffs' Autism Services definition.[134]  Rather, the eight plaintiffs' administrative

records appear to serve as the only evidence regarding the availability of these

services.[135]  These discrete due process outcomes — which represent such a small

percentage of the proposed class and subclass — are insufficient to create the

inference of a blanket approach regarding these additional Autism Services.[136]

While it is plausible that the eight plaintiffs' IEP teams unlawfully denied some or

all of these services, this is insufficient to establish the existence of a *systemic*

policy against making such recommendations.[137]

Accordingly, plaintiffs' definition of Autism Services is modified as

follows:

(a) 1:1 instruction with a teacher for all or part of the day; (b)

---

[134]    These services are: (d) parent training at home; (e) services to promote inclusion; (f) training for staff; (g) rehabilitation training; (h) leisure training; or (i) instruction in a ratio smaller than 6:1:1 for students in a public school.

[135]    *See* Exs. A-H to Hyman Reply Decl.

[136]    As explained, the Autism Services Class is likely comprised of more than thirteen-thousand students, of which at least several hundred request due process hearings each year.  *See School-Age Student Reports: Statewide Totals as of October 1, 2014 By Disability, County and School District*, http://www.p12.nysed.gov/sedcar/state.htm; 7/31/12 FOIL Letter at 1.  *Accord Wal-Mart*, 131 S.Ct. at 2555 (holding that plaintiffs had submitted insufficient anecdotal evidence — "about 1 for every 12,500 class members" — to "raise any inference that individual, discretionary . . . decisions are discriminatory").

[137]    *See Wal-Mart*, 131 S.Ct. at 2555.

> Applied Behavioral Analysis ("ABA"); and (c) extended school
> day, after school or home-based services (for students attending
> a school-day program) (the "Modified Autism Services").[138]

Using this modified definition, I am certifying an Autism Services Class and

subclass that are narrowed to address the Autism Services of one-to-one

instruction, ABA, and extended school day, after school, or home-based services

only. As such, class-wide resolution is appropriate given that the requested relief

is limited to an injunction as to certain identified services, which would expand

IEP options for all students and not require any individualized inquiry.[139]

### c.    Typicality

As the Second Circuit has observed, "[t]he commonality and

typicality requirements tend to merge into one another."[140]  Accordingly, the

Autism Services Class and subclass also fulfill Rule 23(a)(3)'s typicality

requirement "'that . . . each class member's claim arises from the same course of

---

[138]    This modified definition of Autism Services should be incorporated into the definition of Autism Services Policies and Practices (which, as discussed, is a term used within the definitions of the Autism Services Class and subclass).

[139]    Of course, the Court "'remains free to modify [this definition] in light of subsequent developments in the litigation.'" *Easterling*, 278 F.R.D. at 45 (quoting *General Tel. Co.*, 457 U.S. at 157).

[140]    *Marisol A.*, 126 F.3d at 376.

events'"[141] — here, the Autism Services Practices and Procedures (as modified). As plaintiffs have adequately established the existence of this blanket policy, they have met their typicality burden.

To contest typicality, defendants rehash their position that the "procedures for developing thousands of [IEPs] do not constitute a 'single course of events' [because] . . . [t]here could be a multitude of reasons underlying the decisions made when developing a student's program."[142]  As explained, however, the Autism Services Practices and Procedures concern a blanket policy regarding the availability of certain services to the class — *i.e.*, a "single course of events" that does not require inquiry into individual IEPs.

### d.    Adequacy

Further, the proposed class representatives and counsel will "fairly and adequately protect the interests" of the Autism Services Class and subclass.[143] As noted, defendants do not dispute that class counsel is qualified to litigate this action.  Further, the proposed class representatives are autistic students who, as a result of the modified Autism Services Policies and Practices, have suffered the

---

[141]    *Central States*, 504 F.3d at 245 (quoting *Robinson*, 267 F.3d at 155).

[142]    City Def. Opp. at 10 (citation omitted).

[143]    Fed. R. Civ. P. 23(a)(4).

harm alleged on behalf of each class member:  restrictions on the types of accommodations that their IEP teams are permitted to consider.

Defendants' sole argument against adequacy is that "the class as defined by Plaintiffs is overbroad, as it must include students who have suffered no harm" because they do not require some or all of the Autism Services.[144]  As explained earlier, that some class members may have a diminished interest in the outcome of this suit does not create a "fundamental" conflict between class representatives and members.[145]  Notably, the requested relief is a class-wide injunction to expand the universe of IEP options — a remedy that would not, as defendants suggest, interfere with individual IEP determinations or force students to accept Autism Services that they do not want or need.[146]

### e.   Ascertainability

Finally, the Autism Services Class and subclass also satisfy Rule 23(a)'s implied requirement of ascertainability as both are based on objective criteria.  The Autism Services Class will consist of all children who are diagnosed with or classified as autistic, reside in New York City, have an IEP, and have been

---

[144]    City Def. Opp. at 12.

[145]    *In re Flag Telecom*, 574 F.3d at 35.

[146]    *See* City Def. Opp. at 14.

subject to the modified Autism Services Policies and Practices (which, as alleged, restricts the IEP options of and thus applies to all class members).  Further, the Due Process Autism Subclass will consist of all members of the Autism Services Class who win IHO, SRO, court orders, or resolution agreements for the Modified Autism Services.  And as with the NPS Class and subclass, precise ascertainability is not required, as this is an action for injunctive, not monetary, relief.[147]

   Defendants' sole argument against ascertainability is mentioned in a footnote which asserts that "the key term 'Autism Services Policies and Practices' is left undefined."[148]  As discussed, however, "Autism Services" and "Autism Services Policies and Practices" are defined in the Fourth Amended Complaint. Further, the modified definition of Autism Services set forth in this Opinion narrows the types of accommodations covered by this definition, including limiting the "research-based instructional strategies" to ABA.

  **B.**  **Rule 23(b)(2)**

   The surviving classes and subclasses easily satisfy Rule 23(b)(2). Systemic violations like those asserted here present a classic case for Rule 23(b)(2)

---

[147] *See, e.g.*, *Marisol A.*, 126 F.3d at 378; *Floyd*, 283 F.R.D. at 171-72.

[148] State Def. Opp. at 24 n.18.

certification.[149]  Echoing their earlier objections, defendants argue that injunctive relief is inappropriate because any such relief would require tailoring to each student's unique IEP needs.  As discussed, however, the relief sought does not require inquiry into individual IEP determinations.  Instead, this relief seeks to expand, on a class-wide basis, the overall menu of IEP options — precisely the type of resolution that Rule 23(b)(2) is suited to provide.

## C.   The Necessity of Class Certification

Finally, I note that class action is the appropriate vehicle for adjudicating the issues raised by this lawsuit.  Absent class certification, thousands of individual students would be required to file for administrative and/or judicial review to assert these concerns.  Such review processes are inefficient, burdensome, and available only to those families with the resources to pursue them.[150]  Defendants raise several additional arguments against the propriety of

---

[149]    *See, e.g.*, *R.A.G. v. Buffalo City School Dist. Bd. of Educ.*, 569 Fed. App'x 41 (2d Cir. 2014).  *See also Houser v. Pritzker*, 28 F. Supp. 3d 222, 249 (S.D.N.Y. 2014) ("At this stage in the litigation, it is not necessary to speculate about the precise contours of such relief.  All that matters is that the Court has the equitable power and practical ability to fashion some form of injunctive or declaratory relief that would apply to all members of the proposed (b)(2) class.").

[150]    Defendants' argument that *Jose P. v. Ambach*, 96 Civ. 1834 (E.D.N.Y.), bars certification here also lacks merit.  Although *Jose P.* also involved RSAs, that case implicated different claims and a different class definition.

class certification, none of which are persuasive.

First, defendants suggest that the Court should "disregard" the allegation that it is difficult to assert procedural rights under the IDEA because "numerous advocacy groups exist" for "parents of lesser means" and the "IDEA's fee-shifting provision has spawned numerous practitioners who work on something akin to a contingency basis."[151]  Although these options are encouraging, they are not universally available and cannot eliminate the burdens that piecemeal litigation places on families and the court system.[152]  And as the City Defendants themselves have conceded, administrative officers are "not . . . empowered to resolve this sort of system-wide claim."[153]

Second, defendants argue that certification should be denied because "there is a system in place" to seek administrative review of the issues raised by this lawsuit.[154]  As discussed, however, the administrative process is neither readily accessible to all families nor an efficient avenue for addressing systemic claims.

---

[151]    City Def. Opp. at 12 n.3.

[152]    During the 2011-2012 school year, there were over one-thousand due process hearings in New York City at which parents did not have legal representation.  See 7/31/12 DOE FOIL Letter at 4.

[153]    City Defendants' Memorandum of Law in Support of Motion to Dismiss the First Amended Complaint at 14 (Dkt. No. 26).

[154]    City Def. Opp. at 10.

*Third*, defendants suggest that class certification is unnecessary because any judgment for plaintiffs would spur defendants to apply that favorable determination to all similarly-situated students.  Although the Second Circuit has found (b)(2) certification unnecessary where a defendant "represented" that it "had no intention of reinstating" a challenged policy,[155] defendants have made no such representations here.  Although it is probable that defendants *would* alter their policies after receiving an unfavorable judgment, a defendant's representations must be "express,"[156] or otherwise "explicit,"[157] before class certification may be denied on this basis.  And it is nonetheless possible that defendants could respond to an adverse judgment by changing some, but not all, unlawful aspects of their decision-making.  Thus, to accept this argument would deeply undervalue the class action, a mechanism that has proved so important in addressing defects within the public education system.

## V.     CONCLUSION

---

[155]     *Laumann v. National Hockey League*, No. 12 Civ. 3704, 2015 WL 2330107, at *18 (S.D.N.Y. May 14, 2015) (quoting *Daniels v. City of New York*, 198 F.R.D. 409, 420 (S.D.N.Y. 2001) (explaining the holding in *Galvan v. Levine*, 490 F.2d 1255 (2d Cir. 1973))).

[156]     *Cutler v. Perales*, 128 F.R.D. 39, 46-47 (S.D.N.Y. 1989).

[157]     *Dajour B. ex rel. L.S. v. City of New York*, No. 00 Civ. 2044, 2001 WL 1173504, at *10 (S.D.N.Y. Oct. 3, 2001).  *Accord Laumann*, 2015 WL 2330107, at *18.

For the foregoing reasons, plaintiffs' motion for class certification, appointment as class representatives, and approval of class counsel is GRANTED in part and DENIED in part. Class certification is (1) granted in full for the NPS Class and Due Process NPS Subclass; (2) denied for the Lost Services NPS Subclass; (3) and granted, as modified herein, for the Autism Services Class and Due Process Autism Subclass. For the surviving classes and subclasses, plaintiffs' request for appointment as class representatives and approval of class counsel is granted.

The Clerk of the Court is directed to close this motion (Dkt. No. 92). A conference is scheduled for January 15, 2016 at 3:30 PM.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            January 4, 2016

48

**- Appearances -**

**For Plaintiffs**:

Elisa F. Hyman, Esq.
Friedman & Moses LLP
233 Broadway, Suite 901
New York, NY 10279
(212) 732-5800

David A. Rosenfeld, Esq.
Lauren E. Karalis, Esq.
Justin S. Nematzadeh, Esq.
Samuel H. Rudman, Esq.
Andrew L. Schwartz, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

**For Defendants**:

Andrew J. Rauchberg
Thomas B. Roberts
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, NY 10007
(212) 788-0889

William J. Taylor, Jr.
Michael R. Klekman
Assistant Attorneys General
Office of the Attorney General, New York State
120 Broadway, 24th Floor
New York, NY 10271
(212) 416-8610