UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

M.G., et al.,                                                    :
                                                                 :
                                            Plaintiffs,          :
                                                                 :
                   - against -                                   :
                                                                 :        13-CV-4639 (SHS) (RWL)
                                                                 :
NEW YORK CITY DEPARTMENT OF                                      :
EDUCATION; NEW YORK CITY BOARD OF                               :        **DECISION AND ORDER:**
EDUCATION, et al.,                                               :        **MOTION FOR ADVERSE INFERENCES**
                                                                 :
                                            Defendants.          :

------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

This order resolves Plaintiffs' motion pursuant to Federal Rule of Civil Procedure 37 ("Rule 37") for imposition of adverse inferences as a sanction for the failure of Defendant New York City Department Of Education (the "City") to comply with its discovery obligations. The motion is GRANTED IN PART and DENIED IN PART.

**Background**

**A.    The Classes And Class Allegations**

This class action challenges the City's, and New York State's, alleged failure to provide a free and appropriate public education ("FAPE") to New York City school children with autism, as required by the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* ("IDEA"). Plaintiffs, each of whom are parents of children with autism, allege violations of the IDEA, as well as 42 U.S.C. § 1983; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"); the Due Process Clause of the Fourteenth Amendment; the New York State Constitution; and sections of the New York State Education Law. On January 4, 2016, the Court certified four classes and subclasses: the

1

Autism Services Class, the Due Process Autism Subclass, the NPS Class, and the Due Process NPS Subclass. *M.G. v. New York City Department of Education*, 162 F. Supp.3d 216, 225 (S.D.N.Y. 2014) ("*M.G. Class Cert.*").

The Autism Services Class consists of children diagnosed with autism who have Individualized Education Programs ("IEPs") and have been subject to the City's policies and practices with respect to providing autism services. The Due Process Autism Subclass are members of the Autism Services Class who have won or will win administrative decisions or court orders, or entered into resolution agreements, for autism services. For purposes of defining the class, "autism services" refers to three types of services: (i) one-to-one ("1:1") instruction with a teacher for all or part of the day; (ii) Applied Behavior Analysis ("ABA"), and (iii) extended school day, after school, or home-based services (for students attending a school-day program). *M.G. Class Cert.*, 162 F. Supp.3d at 239. Plaintiffs seek to establish that the City lacks the resources and funding necessary to implement autism services; does not have the policies and practices necessary to ensure that children are appropriately and timely evaluated for autism services; does not provide adequate training for teachers and paraprofessionals with respect to autism services; employs blanket policies constraining recommendation of autism services; forces parents into litigation to obtain autism services; and fails to monitor and implement autism services if and when those services are ordered or otherwise provided.

The NPS Class includes children with disabilities who have IEPs, were recommended for or attended an approved non-public school ("NPS") program, and have been or will subject to the "NPS Directive" issued by New York State in 2012. The NPS

Directive stated that NPS students "would no longer be able to receive special education and related services unless those services were offered by or available directly through the particular NPS Program the child was or would be attending." *M.G. Class Cert.*, 162 F. Supp.3d at 228 (quoting the NPS Directive). The Due Process NPS Subclass includes those members of the NPS Class who invoked or will invoke their due process rights, and obtained stay-put rights.[1] With respect to the NPS Class, Plaintiffs allege that the City's implementation of the NPS Directive prevents NPS students from receiving services and remedies to which they are entitled under the IDEA and Section 504. Under those statutes, children attending NPS programs are entitled to the same rights they would have if attending a public school. 20 U.S.C. § 1412(10)(B)(ii); *M.G. Class Cert.*, 162 F. Supp.3d at 227. Plaintiffs further assert that the City does not ensure implementation of related services at NPS programs when ordered or otherwise required; does not monitor and track implementation of related services at NPS programs; and does not fund or provide individualized services for children at NPS programs.

In the operative Fifth Amended Complaint ("FAC"), which Plaintiffs filed four years after the 2016 class certification decision, Plaintiffs include allegations directed to additional subclasses. Two of those subclasses – the Section 504 Autism Services Subclass and the Section 504 NPS Subclass – consist of students who are qualified individuals with disabilities under the meaning of Section 504. (*See* Dkt. 298 ("FAC") ¶¶ 470, 489.)

---

[1] "Stay-put rights," also known as "pendency," mandate that children are entitled to remain in their "then-current educational placement … until all such proceedings have been completed" concerning their placements and services. *See* 20 U.S.C. § 1415(j); *M.G. Class Cert.*, 162 F. Supp.3d at 228.

**B.     The Motion And Order To Compel**

On November 21, 2023 – following years of unsuccessful attempts to obtain the City's full compliance with its discovery obligations – Plaintiffs moved to compel the City to produce documents, including electronically stored evidence ("ESI"), in numerous categories relevant to Plaintiffs' claims, or to otherwise confirm that no responsive documents exist.[2] (Dkt. 402.)  The documents sought included, among others, student records and case files for students' IEPs, evaluations, SESIS data,[3] training curricula for teachers and paraprofessionals, records of classes that offer ABA services, IEP implementation data, IEP compliance documentation, and special education policies and procedures.  (*See* Dkt. 402 Exs. A-F, J.)  Before the City filed its motion to compel, the parties discussed, without success, the possibility of narrowing discovery and obviating the need for production of various categories of documents by having the City admit to certain facts.

Following briefing and a hearing, on February 14, 2024, the Court issued an order granting Plaintiffs' motion to compel (the "Compel Order").  (Dkt. 415.)  Specifically, the Court ordered that "[t]o the extent not otherwise obviated by stipulations, admissions, or other agreement of the parties, Plaintiffs' motion to compel as set forth in Dkt. 402 is granted in its entirety."  (*Id.* ¶ 4.)  The Court directed the parties to continue their efforts to "discuss potential stipulations and admissions with the goal of substantially narrowing

---

[2] Plaintiffs also asked the Court to require the City to "(ii) cross-reference their prior productions; (iii) produce a privilege log reflecting communications withheld or redacted on the basis of privilege; and (iv) provide Plaintiffs and the Court with specific information concerning the search that was conducted to date."  (Dkt. 402 at 37.)

[3] "SESIS" stands for the Special Education Student Information System.

the litigation and the amount of discovery that remains outstanding." (*Id.* ¶ 2.)  At the same time, the Court warned:  "The City's response to most all of [Plaintiffs' document] requests was that they could be obviated by appropriate stipulations or admissions …; that is not a basis for denying or narrowing the discovery requested unless and until agreed-upon stipulations or admissions come to fruition."[4]  (*Id.* ¶ 4.)  The Court further cautioned that "[f]ailure to comply with discovery obligations may result in sanctions including but not limited to adverse inferences." (*Id.* at 2.)  The Court reiterated the same warning in another discovery order on May 16, 2024:  "As warned, failure to comply with discovery obligations and orders may result in sanctions, including but not limited to adverse inferences and/or findings by default and/or any other sanction permitted under law." (Dkt. 434 ¶ 2.)

## C.    The City's Response To The Compel Order

In a continuing effort to try to narrow or obviate the need for the outstanding discovery, the City eventually made 10 judicial admissions (the "Admissions").  (Dkt. 435 at 2.)  Plaintiffs found the City's Admissions unduly narrow, ambiguous, and insufficient to obviate the need for the documents that the City still had not produced.[5]  (Dkt. 520 at 4-

---

[4] In the order issued on February 14, 2024, the Court also noted that "discovery potentially could be narrowed by sampling, or with summary data." (Compel Order at 2.)  The parties have not indicated to the Court that they have pursued these strategies or that they are even viable.

[5] In finding the City's admissions insufficient substitutes for the discovery sought, Plaintiffs explained in part:

> the [City's] Admissions improperly restrict the definition of 1:1
> Instruction to a "ratio" of "instruction" with a "teacher."  Further,
> the City Defendants defined ABA as limited to the service
> under New York State Law 8800, pursuant to which the DOE
> is not required to use licensed providers – a definition of ABA

5.)    Accordingly, under the Compel Order, the City was obligated to produce the documents that were the subject of Plaintiffs' motion to compel and to identify for each request whether documents did or did not exist.  (*See* Dkt. 402 at 17-18 (relief requested on motion to compel included advising whether no responsive documents exist).)

The City repeatedly asked for extensions of the deadline to comply with the Compel Order, which the Court granted.  In granting the sixth such request, however, the Court warned that if the City did not meet the newly-set October 17, 2024 deadline, and absent exceptional circumstances, coercive monetary sanctions would be imposed on the City.  (Dkt. 478 at 2.)  The City ultimately produced some additional documents, but with no assurance that it had produced all or even close to all of the documents required by the Compel Order.  (*See* Declaration of Elisa Hyman ("Hyman Decl."), dated May 20, 2025, at Dkt. 509 ¶¶ 5-6 (identifying categories of documents that the City had not produced).)

**D.    The 30(b)(6) Depositions**

In a further effort to obtain discovery, Plaintiffs noticed and deposed several witnesses designated by the City to testify on its behalf pursuant to Federal Rule of Civil Procedure 30(b)(6).  The City afforded Plaintiffs 17.25 hours for those depositions.

---

not included in the [FAC] or in the Court's decision. Additionally, the City Defendants admitted only that "DOE IEP teams have not recommended," or "DOE IEPs have not included" ABA, but never addressed Plaintiffs' claim that, pursuant to policies and/or practices, ABA ***cannot*** be recommended on an IEP, absent an order.  Further, the Admissions fail to clarify whether the City Defendants recommend ABA on IEPs generally.

(Dkt. 520 at 5 n.4.)

Plaintiffs found that testimony wanting as, according to Plaintiffs, the witnesses lacked knowledge regarding various topics for which they were designated to testify. (Dkt. 493 at 3.) As a remedy, the Court afforded Plaintiffs an additional three hours of questioning about topics or documents for which the City's witnesses purportedly lacked sufficient knowledge, and about documents produced after the depositions had been taken. (Dkt. 496 ¶ 3.) Fact discovery closed on February 28, 2025 (Dkt. 490), except that depositions continued into April 2025. (*See* Dkt. 496.)

**E.    Plaintiffs' Motion For Sanctions**

On May 20, 2025, Plaintiffs filed a motion seeking sanctions against the City pursuant to Rule 37, based on the City's failure to comply with the Court's discovery orders, produce documents, and knowledgeably answer questions posed to NYC's 30(b)(6) deponents. (Dkt. 507; *see also* Dkt. 512 at 4-5 (timeline of the City's failure to provide relevant discovery).) Plaintiffs sought sanctions in the form of a jury instruction drawing more than 80 adverse factual inferences against the City on an extensive array of subjects.[6] (*See* Dkt. 510 (proposed order granting Plaintiffs' motion for sanctions).)

---

[6] The Court rejects the City's argument that 20 of the adverse inferences that were not expressly referenced or discussed in Plaintiffs' opening brief should be deemed abandoned or otherwise denied on that basis. First, there is no prejudice to the City. Plaintiffs expressly addressed 17 of the 20 inferences in question in their reply, and the City was provided with the opportunity to file, and did file, a sur-reply responding to those items. (Dkt. 537.) Second, although three of the 20 inferences were not expressly discussed in either Plaintiffs' opening brief or their reply, the arguments made by the parties for and against the other adverse inferences were similar and extend as well to those three inferences. In any event, the initial briefing on Plaintiffs' motion for sanctions has been supplemented as described below such that both Plaintiffs and the City have expressly addressed each of Plaintiffs' proposed adverse inferences. The Court therefore deems the issue moot.

The City opposed, arguing that Plaintiffs are not entitled to the adverse inferences sought because Plaintiffs had not established any of the elements required to warrant an adverse inference or any other sanction: namely, that the documents or information exist, that the City had a culpable state of mind, that the documents and information sought are relevant, or that Plaintiffs will be prejudiced. (Dkt. 532.) After reply and sur-reply briefing, the Court held a hearing on November 4, 2025. (Dkt. 551 ("Hearing Transcript").)

## F.    The Certification Order

At that hearing, the Court noted two impediments to addressing the motion for sanctions. First, the City had never clarified to what extent the documents at issue actually existed and were not produced, or instead simply did not exist. Second, the parties' briefing addressed the proposed adverse inferences at an overly general level (in part due to page restrictions). On November 4, 2025, the Court therefore ordered the parties to engage in a three-step process requiring that:

> (1) [the City] … certify, with respect to each of Plaintiffs' document requests, which documents do not exist; which documents exist and have been produced in full; and which documents exist but have not been produced in full; (2) Plaintiffs … file a supplement to their motion addressing each requested adverse inference individually and addressing in particular … what ties the inference to the respective discovery failure and justifies the scope of inference sought, and the particular prejudice incurred (including, where relevant, accounting for the insufficiency of admissions submitted by [the City]); and (3) [the City] file a response, if any.

(Dkt. 542 (the "Certification Order") at 1.)

8

**G.    The City's Non-Compliance With The Certification Order**

On January 9, 2026, however, the City informed Plaintiffs and the Court that the City was unable to certify *any* aspect of its production with respect to whether documents existed and were produced, existed and were not produced, or never existed.  (Dkt. 553; *see also* Dkt. 561 at 1 (Plaintiffs stating that "The City Defendants have confirmed that they are unable to certify any aspect of their production (i.e., whether documents exist/existed and were not produced, or whether documents never existed")).)    In requesting an extension of time for it to file a certification, the City explained its inability to provide the certification directed by the Court:

> [D]espite our best efforts, this office is unable to submit a customary form of certification that the … Scheduling Order may be directing. This inability arises from the fact that the searches for and gathering of the DOE's production were conducted over the span of a full decade. They were performed not by a single or even several custodians, but instead by numerous DOE officers and staff, even for those document responsive to only a single request, and many of the personnel who executed and responded to those searches are no longer employed by the DOE, either at all or in the capacity in which they assisted with this case. The most that City Defendants can do is to certify upon information and belief, based on DOE staff's search for and retrieval of available old emails between staff who are still at DOE and former staff who were tasked with the search for responsive documents.

(Dkt. 553 at 1-2.[7])

The Court granted the requested extension.  (Dkt. 554.)  But at a conference held on January 20, 2026, the City reiterated its inability to provide the requisite certification, and admitted that the City "did not properly do certifications along the way" for the

---

[7] "DOE" refers to the New York City Department of Education.

9

documents it had searched, collected, and produced.  (Dkt. 559 at 3.)  And, in a status report submitted on February 5, 2026, the City again acknowledged its inability to reconstruct the details of its document productions and that "the City is already thereby prevented from rebutting inferences with a simple declaration that all responsive documents were produced after a diligent search."  (Dkt. 561 at 3.)  The City never filed a certification, whether on information and belief or otherwise.

## H.    The Supplemental Sanctions Briefing

In a further effort to refine and narrow the parties' dispute with respect to adverse inferences, the parties proposed, and the Court adopted, a modified process by which: (1) Plaintiffs submit a revised proposed adverse inference list with specific information to justify each inference; (2) the City responds; (3) Plaintiffs reply; (4) the parties meet and confer; and (5) the parties file with the Court any adverse inferences upon which the parties do not agree, along with Plaintiffs' specifications as to why the particular inference is warranted, and the City's arguments as to why the inference is not warranted.  (Dkt. 562 at 3.)  The parties completed the first three steps of that process by May 11, 2026, when Plaintiffs filed their reply.  (Dkts. 596-597.)  The City filed a short sur-reply on May 18, 2026, which the Court accepted.  (Dkts. 598-599.)

The parties' updated and expanded filings are extensive and include, in addition to exhibits, Plaintiffs' 135-page Supplemental Memorandum Of Law In Further Support Of Plaintiffs' Motion For Sanctions In The Form Of Adverse Inferences Against The City Defendants at Dkt. 573 ("Pl. Mem."); the City's combined 63-page Supplemental Memorandum Of Law In Opposition at Dkt. 594 ("City Opp.") and attached Appendix at Dkt. 594-1 ("City Opp. App."); and Plaintiffs' combined 130-page Response In Further

Support at Dkt. 596 ("Pl. Reply") and attached Appendix at Dkt. 596-1 ("Pl. Reply App.").

Although the parties did not file the joint submission contemplated by the fifth step of the

process, the existing submissions reflect that the parties met and conferred, and that

Plaintiff has reduced the number of proposed adverse inferences in dispute to 60 and has

modified or narrowed some of them. The parties' current filings are amply sufficient for

the Court to rule.

**Legal Standards**

Rule 37 "governs the district court's procedures for enforcing discovery orders and

imposing sanctions for misconduct." *World Wide Polymers, Inc. v. Shinkong Synthetic

Fibers Corp.*, 694 F.3d 155, 158 (2d Cir. 2012); *accord Marquez v. Hoffman*, No. 18-CV-

7315, 2022 WL 4076016, at *12 (S.D.N.Y. Sept. 6, 2022), *R&R adopted sub nom.

Marquez v. Silver*, 2023 WL 2088522 (S.D.N.Y. Feb. 17, 2023). "If a party ... fails to obey

an order to provide or permit discovery, … the court where the action is pending may

issue further just orders." Fed. R. Civ. P. 37(b)(2)(A). "A district court has wide discretion

to impose sanctions, including severe sanctions, under Federal Rule of Civil Procedure

37." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294 (2d Cir. 2006).

The rule authorizes a range of sanctions, including, among others, dismissal or

default judgment, striking of pleadings, preclusion, directing that facts be taken as

established, and mandatory adverse inference instructions. Fed. R. Civ. P. 37(b)(2)(A)(i)-

(iii), (v), (vi); *In re Terrorist Attacks on September 11, 2001*, No. 03-MDL-1570, 2013 WL

5788307, at *1 (S.D.N.Y. Oct. 28, 2013); *Linde v. Arab Bank, PLC*, 269 F.R.D. 186, 195

(E.D.N.Y. 2010). "Even in the absence of a discovery order, a court may impose sanctions

on a party for misconduct in discovery under its inherent power to manage its own affairs."

*Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002) (citing *DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124, 135-36 (2d Cir. 1998)).

The Second Circuit has identified four non-exhaustive factors to assist courts in determining whether to impose sanctions under Rule 37: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance[;] and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *Agiwal v. Mid Island Mortgage Corp.*, 555 F.3d 298, 302 (2d Cir. 2009) (internal quotation marks and citation omitted). The four *Agiwal* factors "are not exclusive, and they need not each be resolved against" a party to warrant sanctions. *Southern New England Telephone Co. v. Global NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010).

Where, as here, the moving party seeks an adverse inference based on non-production of evidence, "the moving party must demonstrate: (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find it would support that claim or defense." *Doug's Word Clocks.com Pty Ltd. v. Princess International, Inc.*, 323 F.R.D. 167, 172 (S.D.N.Y. 2017) (internal quotation marks and citation omitted); *see also Residential Funding Corp.*, 306 F.3d at 107 (articulating same requirements). To satisfy the first prong, "the moving party must show that the respondent breached its obligations, either as set forth in Rule 26 ... or as

12

provided in court orders regulating discovery." *In re September 11th Liability Insurance Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007).

"The 'culpable state of mind' element is satisfied by a showing that 'a party has breached a discovery obligation … through bad faith or gross negligence or ordinary negligence.'" *Id.* (quoting *Residential Funding*, 306 F.3d at 113); *see also Hoffer v Tellone*, 128 F.4th 433, 438-39 (2d Cir. 2025) (holding that the requisite state of mind for sanctions under Rule 37(e)(2) governing failure to preserve ESI is "intent to deprive," but not calling into question the *Residential Funding* standard for cases outside of Rule 37(e)(2)). Where a party has failed to preserve or has destroyed ESI, the culpable state of mind required for sanctions such as an adverse inference instruction requires "intent to deprive" the requesting party of the evidence sought. *See* Rule 37(e)(2); *Hoffer*, 128 F.4th at 438.

Prejudice is also a consideration. *Royal Park Investments SA/NV v. U.S. Bank National Association*, 319 F.R.D. 122, 126 (S.D.N.Y. 2016) ("Prejudice to the moving party may also be a significant consideration, though not an absolute prerequisite in all circumstances"). A noncompliant party may avoid or lessen sanctions if it can "demonstrate that the other parties did not suffer any prejudice from the [violation]." *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 24-25 (S.D.N.Y. 2010). "Where the discovery violation involves spoliation or withholding of evidence, the absence of prejudice can be shown by demonstrating, for example, that the other parties were able to obtain the same evidence from another source, or that during discovery they never asked for the evidence later shown to have been spoliated." *Id*. at 25.

Discovery sanctions serve multiple functions, including deterrence, assignment of risk, and remediation. *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 780 (2d Cir.

1999) (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). Accordingly, "the applicable sanction should be molded to serve th[ose] prophylactic, punitive, and remedial rationales." *West*, 167 F.3d at 779; *see also Royal Park Investments*, 319 F.R.D. at 126 ("Discovery sanctions serve a three-fold purpose: (1) to ensure that a party will not benefit from its failure to comply; (2) to obtain compliance with the Court's orders; and (3) to deter noncompliance, both in the particular case and in litigation in general"). Generally, "a court should always impose the least harsh sanction that can provide an adequate remedy." *Pension Committee of University of Montreal Pension Plan v. Banc of America Securities*, 685 F. Supp.2d 456, 469 (S.D.N.Y. 2010), *abrogated on other grounds by Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012); *see also Royal Park Investments*, 319 F.R.D. at 128 ("A court should seek to impose the least harsh sanction that will remedy the discovery violation and deter such conduct in the future").

## Discussion

As discussed below, the Court finds that sanctions are appropriate. The City did not comply with two court discovery orders and acted negligently, both in failing to produce all documents required by the Compel Order, and in failing to certify which documents had been produced and which remained outstanding as required by the Certification Order. Those failures have prejudiced Plaintiffs and warrant a remedy. The adverse inferences proposed by Plaintiffs, however, are too extreme: lesser sanctions are warranted. Additionally, the Court finds that no sanctions are warranted in connection with the City's 30(b)(6) testimony.

14

**A.      Nature Of The Alleged Violation**

A threshold issue is which subsection of Rule 37 applies to Plaintiffs' motion. Plaintiffs assert that Rule 37(b) governs the circumstances before the Court.  (Pl. Reply at 3.)  The City urges that Rule 37(e) applies because most all the discovery sought by Plaintiffs is in the form of ESI.  (City Opp. at 4-5.)  The answer can be significant because, as noted above, adverse inference sanctions under Rule 37(e) are appropriate only if the non-producing party acted with the "intent to deprive" its adversary of the evidence sought.

Plaintiffs are correct that their motion is governed by Rule 37(b).  The motion for adverse sanctions is premised on the City's failure to comply with the Court's Compel Order.  By granting Plaintiffs' motion to compel in its entirety, that order required the City to fully comply with all of the document requests that were the subject of the motion to compel.  Plaintiffs contend that the City has failed to do so by not producing a wide array of documents.  Plaintiffs also fault the City for not complying with the Court's Certification Order requiring certification for each document request as to whether the documents were produced, withheld, or did not exist.  As both contentions are based on violation of the Court's discovery orders, Rule 37(b) squarely governs.

Rule 37(e) does not apply here.  Even though most all the discovery sought is electronically stored, Rule 37(e) specifically addresses spoliation of ESI – that is, the destruction of or failure to preserve ESI.  *See* Fed. R. Civ. P. 37(e) (stating that the rule applies where "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery");

*Allstate Insurance Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 457 (2d Cir. 2007) ("'Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation'") (quoting *West*, 167 F.3d at 779).  The City has not suggested to Plaintiffs or the Court that the documents Plaintiffs seek were at one time electronically stored but then lost or destroyed.  The issue is not the City's spoliation of ESI.  Rather, it is the City's failure to produce all requested documents as required by the Court's Compel Order and its failure to certify what the City has and has not produced.

Because Rule 37(e) does not govern the instant motion, Plaintiffs need not establish that the City intended to deprive Plaintiffs of evidence.[8]

## B.    Sanctions Are Warranted

The Court has little difficulty finding that sanctions are warranted under Rule 37(b) for the City's failure to comply with the Court's discovery orders.[9]

### 1.    The City Failed To Comply And Was Warned Of The Consequences[10]

---

[8] As discussed below, if "intent to deprive" were the applicable standard, Plaintiffs have not demonstrated that the City acted with such intent.

[9] The City's failure to comply with its document production obligations also arguably warrants sanctions under Rule 37(c)(1), which authorizes sanctions for failure to supplement discovery as required by Fed. R. Civ. P. 26(e).  Plaintiffs, however, did not advance that argument, and the Court declines to address it sua sponte, particularly as the City has not had an opportunity to respond to such argument.  *See Margolin v. National Association of Immigration Judges*, 608 U.S. ___, 2026 WL 1463466, at *2 (S. Ct. May 26, 2026) (explaining "the principle of party presentation").

[10] This section explicitly or implicitly accounts for the first, third, and fourth *Agiwal* factors.  The second factor, consideration of lesser sanctions, is accounted for in the section below discussing the appropriate sanction.

The Court's Compel Order required the City to comply with all of Plaintiffs' outstanding document requests. (Dkt. 415.) The City did not do so. The Court's Certification Order required the City to certify the documents that existed and it produced, the documents that existed and that the City did not produce, and the documents that never existed. (Dkt. 542.) Again, the City did not do so. The City's period of non-compliance with Plaintiffs' document requests has lasted for years, and fact discovery is closed. The Court warned the City on multiple occasions that failure to comply with its discovery obligations may result in sanctions "including but not limited to adverse inferences." (*See* Dkts. 415 at 2, 434 ¶ 2.) In short, the City did not comply with the Court's discovery orders and was repeatedly advised of the potential consequences for failing to do so.

The City argues that Plaintiffs are not entitled to sanctions because they have not met their burden to show by a preponderance of the evidence that any non-produced documents actually exist. (City Opp. at 2-4.) The Court agrees that sanctions for failure to produce documents necessitates that the documents sought exist or previously existed. *See Farella v. City of New York*, No. 05-CV-5711, 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007) ("for sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence **actually existed**")*.*

There is at least one group of documents that Plaintiffs have not demonstrated exist, or ever existed; indeed, Plaintiffs' proposed adverse inferences in connection with those documents purport to establish the **non-existence** of such documents. Specifically, eight of Plaintiffs' adverse inferences – what the Court refers to as the "No Written Policy Group" – assert that the City has "[n]o written policies, procedures,

17

guidelines, or other similar operational documents about" a particular subject. (*See* Dkt. 574 at 8-16 ¶¶ 1, 3-8, 52.) As no such documents have been demonstrated to exist, sanctions are not warranted with respect to this group. *See Hoffer*, 128 F.4th at 441 (affirming denial of adverse inference where there was insufficient evidence that allegedly spoliated video even existed); *Foster v. United States*, 771 F. Supp.3d 341, 371-72 (S.D.N.Y. 2025) (denying adverse inference sanction where "[t]he more plausible inference from the absence of sale documents is thus that such documents never existed, not that they were destroyed"); *Tri-County Motors, Inc. v. American Suzuki Motor Corp.*, 494 F. Supp.2d 161, 177 (E.D.N.Y. 2007) (declining to impose sanctions and stating, "speculative assertions as to the existence of documents do not suffice to sustain a motion for spoliation of evidence"), *aff'd*, 301 F. App'x 11 (2d Cir. 2008) (summary order).

But with respect to other documents, the City's argument is disingenuous for at least three reasons. First, in their motion to compel, Plaintiffs detailed numerous categories of documents that were not produced. (*See* Dkt. 402 at 17-36.) The City responded not by arguing that the documents did not exist, but rather that the Court should not require the City to produce them and, for most categories, should instead adopt certain proposed stipulations or admissions in lieu of producing documents.[11] (*See, e.g.*, Dkt. 411 at 18-25.)

Similarly, upon filing their motion for sanctions, Plaintiffs identified numerous categories of documents that the City still had not produced, such as (but not limited to)

---

[11] The City also argued that the Court should not require production of documents regarding certain subject matters on the basis that those subject matters were outside the parameters of the lawsuit. (Dkt. 411 at 10-17.) The Court necessarily rejected those arguments in granting the Plaintiffs' motion to compel in its entirety.

updated SESIS data, updated impartial hearing records, implementation data, and records of children recommended for particular services. (Hyman Decl. ¶¶ 5-6.) The City has never represented to the Court that it has produced all of the required documents for even *one* of those categories.

The City's "existence" argument focuses in particular on one category of documents: policy documents, and more specifically, policy documents about services the City "do[es] not consider or provide." (City Opp. at 3.) "As an example," the City asserts, "Plaintiffs proposed inference no. 2 would direct the factfinder to accept not just the assertion that 'City Defendants do not assess or evaluate Children with Autism to ascertain whether they require ABA Services' but also the unfounded assumption that they do so '[a]s a matter of Policy, Practice and Procedure.'" (*Id.* (quoting Pl. Mem).) To some extent, that distinction is sophistry. If the City does not provide a particular service, it necessarily has a practice of not providing that service. On the other hand, the Court agrees that just because the City does not provide a particular service does not mean it has a formal policy in that regard or has documents articulating such a policy. The Court accounts for this nuance in formulating the appropriate sanction below. Moreover, the City's point is a narrow one. It does not apply to the existence of non-policy documents, such as (but not limited to) SESIS data, training materials, and IEPs.

Second, the City concedes that it did not update its production of at least one substantial set of documents – SESIS records – instead banking on drafting proposed admissions that it hoped would obviate the need for further production of records. (City Opp. at 9-10; *see also* Hearing Transcript at 27 (City's counsel stating at oral argument that "[w]e acknowledge that updated data was not produced" and that doing so "may have

19

been a gamble").)  The City blames its failure on "short successive discovery deadlines," staff shortages, and the need to both send out a privacy notice and redact personally identifying information.  (City Opp. at 9-10.)  While the Court recognizes limitations on the City's resources, it had more than a year to comply with the Court's Compel Order (let alone from the time the document requests were served) and has not provided ***any*** evidence or supporting testimony that it could not comply in producing complete data and records during that time.[12]  What is more, the City's proffered excuses are post hoc justifications; the City did not raise these purported procedural impediments at the time they arose.

Third, the very reason the existence or non-existence of the complete universe of existing, non-produced documents cannot be pinpointed is due to the City's own failures. The City admits that it "is unable to submit a ***customary*** form of certification" that it has produced all documents after a diligent search. (Dkt. 553 at 1 (emphasis added).) Although ordered to do so, the City has failed to identify what responsive documents it has produced in full, what documents exist but were not produced, and what documents never existed.  The City attributes its inability to "the fact that the searches for and gathering of the DOE's production were conducted over the span of a full decade" with a shifting array of personnel.  (Dkt. 553 at 1.)  That may be an explanation, but it is not an excuse.  By its own admission, the City failed to properly maintain a reliable record of what responsive documents it searched for, what documents it produced, and which responsive documents existed but were not produced.  (Dkt. 559 at 3 (admitting that the

---

[12] The Compel Order issued on February 14, 2024; discovery closed on February 28, 2025.

City "did not **properly** do certifications along the way" (emphasis added).)  Under such circumstances, Plaintiffs should not be faulted for failing to specify exactly which responsive documents existed but were not produced by the City.

### 2.    The City Acted At Least Negligently

In considering the City's "culpable state of mind," the Court finds that the City's failures to comply with the Court's Compel Order and Certification Order were caused by the City's negligence.  "In the discovery context, negligence is a failure to conform to the standard of what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding." *In re Pfizer Inc. Securities Litigation*, 288 F.R.D. 297, 314 (S.D.N.Y. 2013) (internal quotation marks and citations omitted); *see also Pension Committee of University of Montreal*, 685 F. Supp.2d at 464 ("A failure to conform to this standard is negligence even if it results from a pure heart and an empty head").  The City concedes that it did not "properly" maintain certifications of its document searches and productions.  (Dkt. 559 at 3.)  And, the City admits that it did not update its SESIS production at least due to "disorganization."  (Dkt. 594 at 7-8.)  These failures constitute negligence.

The City also chose to rely on the prospect of obviating the need to comply with its discovery obligations by crafting stipulations or admissions that it presumed would be acceptable to Plaintiffs.  The City did so even though the Court, while encouraging the parties' efforts in that regard, warned that the City's discovery obligations could not be avoided by potential stipulations or admissions "unless and until agreed-upon stipulations or admissions come to fruition."  (Dkt. 415 at 1-2.)  The City's decision to choose that path was careless.  But it does not evince bad faith, intent to deprive, or even gross negligence.

21

*See Pension Committee of University of Montreal*, 685 F. Supp.2d at 464-65 (explaining gradations of a culpable mind and stating that, in the tort context, "[g]ross negligence has been described as a failure to exercise even that care which a careless person would use" and that "most courts find that gross negligence is something more than negligence and differs from ordinary negligence only in degree, and not in kind") (internal quotation marks and citation omitted).  Further, Plaintiffs have not put forward any evidence to establish that the City made *no* effort to collect and produce documents in response to the Compel Order.  To the contrary, the City produced some documents, even if it did not produce the lion's share of what remained outstanding.

Plaintiffs argue that the City acted with a higher degree of culpability, asserting that the City acted with an intent to deprive Plaintiffs of useful evidence.  (Pl. Reply at 4-11.) They argue that the City's discovery failings are similar to those in *PDV USA, Inc. v. Interamerican Consulting*, 20-CV-3699, 2026 WL 203036 (S.D.N.Y. Jan. 27, 2026), where this Court inferred an intent to deprive and granted adverse inference sanctions for the defendant's spoliation of ESI.  (Pl. Reply at 7-11.)  That case, however, involved far different facts.  In *PDV*, the Court found, among other transgressions, that the defendant, accused of fraud:  failed to put a timely document hold in place; engaged in intentional, selective spoliation of text messages and email; misrepresented that documents were not in its possession; and repeatedly provided non-credible excuses and explanations.  2026 WL 203036 at *19-20.  While Plaintiffs portray the City as, like the defendant in *PDV*, having offered shifting explanations, making contradictory representations, and obfuscating and obstructing Plaintiffs' efforts to obtain discovery, the City's conduct does not rise to the level of the defendant's purposeful, bad faith conduct in *PDV*.

### 3.    No Sanctions For 30(b)(6) Witness Testimony

Plaintiffs contend that adverse inference sanctions also are warranted due to the City's inadequate testimony of its 30(b)(6) witnesses.  (*See* Dkt. 512 at 5 ("some of the City Defendants' designees lacked any knowledge regarding several topics that they were designated to testify about"); Dkt. 574 at 2 (seeking instruction that the City failed to provide relevant testimony).)  The Court is not persuaded.  Plaintiffs have not shown that the City's witnesses, considered together, did not provide knowledgeable answers to the questions asked.   Nor have Plaintiffs shown, again accounting for the witnesses' testimony as a whole, that the witnesses were not adequately prepared.

Rule 30(b)(6) governs depositions of an organization, be it a corporation, association, municipality, or the like.  Persons designated by the organization to testify on its behalf are obligated to testify about "information known or reasonably available to the organization."  Fed. R. Civ. P. 30(b)(6).  The organization "has an affirmative duty to make available such number of persons as will be able to give complete, knowledgeable and binding answers on its behalf," and "[p]roducing an unprepared witness is tantamount to a failure to appear."  *Kyoei Fire & Marine Insurance Co., Ltd., v. M/V Maritime Antalya*, 248 F.R.D. 126, 152 (S.D.N.Y. 2007) (internal quotation marks and citations omitted); *accord Coty Inc. v. Excell Brands, LLC*, No. 15-CV-7029, 2016 WL 7187630, at *2 (S.D.N.Y. Dec. 9, 2016).  At the same time, a 30(b)(6) witness is not expected to know and testify about every detail, so long as the organization made a "conscientious good faith endeavor" to prepare the witness to "answer fully, completely, and unevasively, the questions posed as to the relevant subject matters."  *Eid v. Koninklijke Luchtvaart Maatschappij N.V.*, 310 F.R.D. 226, 228 (S.D.N.Y. 2015) (internal quotation marks

omitted). "In order for the Court to impose sanctions, the inadequacies in a deponent's testimony must be egregious and not merely lacking in desired specificity in discrete areas." *Kyoei Fire*, 248 F.R.D. at 152 (internal quotation marks and citation omitted).

Most of the instances noted by Plaintiffs where the City's witnesses did not know answers to the questions asked ***pre-date*** the supplemental testimony that the Court awarded to address that very issue. For example, Plaintiffs' initial sanctions briefing, filed May 21, 2025, cites to deposition testimony taken on February 13, 2025 (Dkt. 512 at 21, 23, citing testimony of Dinh Lu-Berio), February 18, 2025 (*id.* at 17-19, citing the first deposition of Michelle Netzler), and February 26, 2025 (*id.* at 19, 21, citing testimony of Alan Powers, and 19, 22, 24, citing testimony of Sapna Kapoor). The Court's order requiring the City to produce 30(b)(6) witnesses for further questioning was issued on March 4, 2025. (Dkt. 496.) Plaintiffs then took further 30(b)(6) deposition testimony on April 4 and 18, 2026. (Hyman Decl. ¶ 7 (listing exhibits, including deposition transcripts and their dates).) Although the supplemental 30(b)(6) deposition time granted to Plaintiffs came at the end of fact discovery, Plaintiffs did not renew their complaint to the Court that the additional testimony was inadequate. Instead, they proceeded with their motion for sanctions. Even now, Plaintiffs have not identified in their supplemental briefing any questions for which the witness did not have sufficient knowledge when considering the additional deposition time. To the contrary, Plaintiffs extensively cite the City's 30(b)(6) deposition testimony as proof supporting and confirming the adverse inferences they seek. (*See* Pl. Reply App. at 5-6, 10, 18-19, 28, 32-35, 37-38, 40, 47, 51-53, 55, 58, 60, 61, 63, 65, 68, 70-71, 73, 75-77, 79-87, 91-93, 95, 103, 105, 107, 110.)

Plaintiffs also have not provided the information necessary to determine whether the City adequately prepared its witnesses. "If a party complains that a 30(b)(6) deponent provided insufficient answers, the Court must consider whether the lack of knowledge in the answers is a result of insufficient preparation." *In re OpenAI, Inc., Copyright Infringement Litigation*, No. 25-MD-3143, 2026 WL 937014, at *2 (S.D.N.Y. Apr. 7, 2026). Plaintiffs could have questioned the deponents whose answers they found insufficient to find out about what they did to prepare. Did the witness review documents? If so, which ones? Did the witness speak with present employees? Former employees? How much time did the witness spend preparing? These are the types of questions an attorney would ask at deposition to determine if the witness was not sufficiently prepared. Plaintiffs, however, have not identified in their briefing any such lines of questioning.

Accordingly, the Court finds that sanctions are not warranted in connection with the City's 30(b)(6) witness testimony.

## C.    The Appropriate Sanction

The only form of sanctions sought by Plaintiffs is an adverse inference, albeit 60 of them. An adverse inference can take several forms with varying degrees of severity:

> In its most harsh form … a jury can be instructed that certain facts are deemed admitted and must be accepted as true. At the next level, … a court may impose a mandatory presumption. Even a mandatory **presumption**, however, is considered to be rebuttable. The least harsh instruction **permits** (but does not require) a jury to **presume** that the lost evidence is both relevant and favorable to the innocent party.

*Pension Committee of University of Montreal*, 685 F. Supp.2d at 470.

An adverse inference serves the remedial purpose "to restore a prejudiced party to the 'position he would have been in absent'" non-production of the evidence by the

25

opposing party. *Raymond v. City of New York*, No. 15-CV-6885, 2020 WL 7055572, at *7 (S.D.N.Y. Dec. 2, 2020) (quoting *Kronisch*, 150 F.3d at 126); *accord Chevron v. Donziger*, 296 F.R.D. 168, 222 (S.D.N.Y. 2013).

### 1.    The Elements For An Adverse Inference Are Met

As recited above, to warrant an adverse inference based on non-production of evidence, "the moving party must demonstrate: (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find it would support that claim or defense." *Doug's Word Clocks.com*, 323 F.R.D. at 172 (internal quotation marks and citation omitted). The adverse inference inquiry requires the Court to consider the interplay between the nature of any unproduced documents, their potential relevance, the degree of any culpability attributable to the non-movant, and any prejudice resulting from the failure to produce. *See Pension Committee of University of Montreal*, 685 F. Supp.2d at 463.

The Court already has addressed the City's obligation to produce the documents at issue as required by the Compel Order. The Court also has determined that the City was at least negligent, which is a sufficiently culpable state of mind to impose an adverse inference. *Residential Funding*, 306 F.3d at 108; *Hoffer*, 128 F.4th at 439 ("we do not call into question the applicability of *Residential Funding* to cases that fall outside the province of Rule 37(e)(2)"); *Stinson v. City of New York*, No. 10-CV-4228, 2016 WL 54684, at *5 (S.D.N.Y. Jan. 5, 2016) ("The 'culpable state of mind' required for the imposition of an adverse inference is determined via a case-by-case approach, and may be satisfied

where the party destroying evidence acted in bad faith, with gross negligence, or even with simple negligence"); *Phoenix Four, Inc. v. Strategic Resources Corp.*, No. 05-CV-4837, 2006 WL 1409413 at *4 (S.D.N.Y. May 23, 2006) ("The 'culpable state of mind' requirement is satisfied in this circuit by a showing of ordinary negligence").[13]

As for relevance and prejudice, the Court previously found that the parties' initial sanctions briefing addressed those subjects at too general a level to be able to assess the propriety of Plaintiffs' proposed adverse inferences.  (*See* Hearing Transcript at 23-24.)  The Court therefore ordered the parties to submit supplemental briefing addressing each proposed adverse inference at an individual level.  (Dkt. 542.)  Plaintiffs did so, addressing across 121 pages the relevance and prejudice for each of the 60 adverse inferences they proposed.  (Pl. Mem. at 14-135.)  Defendants responded in kind, although in considerably less detail.  (City Opp. App. at ECF 1-37.)  In reply, across another 113 pages, Plaintiffs defended the relevance of, and prejudice they would incur without, the non-produced documents.  (Pl. Reply App. at 1-113.)  Having reviewed the entirety of the parties' arguments, the Court finds that the documents that exist but which the City did not produce are relevant, that they would be helpful to proving Plaintiffs' claims, and that Plaintiffs are prejudiced without them.[14]

---

[13] Courts have observed that making an adverse inference instruction an available remedy for even ordinary negligence "protects the innocent litigant from the destruction of evidence by a spoliator who would otherwise assert an 'empty head, pure heart' defense … It is cold comfort to a party whose potentially critical evidence has just been destroyed to be told that the spoliator did not act in bad faith." *Orbit One Communications, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 438 (S.D.N.Y. 2010).

[14] In most instances, the prejudice stems in part or in whole from Plaintiffs' need to prove a negative, such as the absence of a particular policy or practice.

The City argues that its 10 Admissions, along with the City's 30(b)(6) deposition testimony and the documents that it *did* produce, obviate the need for any of Plaintiffs' proposed adverse inferences.  (City Opp. at 14-22.)  The Court disagrees.  The 10 Admissions are narrower and cover far fewer subjects than Plaintiffs' proposed adverse inferences.[15]  (*Compare* Dkt. 435 at 2 ¶¶ 14-23, *with* Dkt. 574 at 8-17 ¶¶ 1-60.)  And, while the deposition testimony and documents the City cites address relevant subject matter, they do not substitute for the fulsome discovery to which Plaintiffs were entitled.  For instance, Plaintiffs' proposed adverse inference No. 17 essentially asserts that a particular service, "SETSS,"[16] is limited to addressing certain learning delays and cannot be recommended for other specified purposes.  (Pl. Reply App. at 31.)    Responding to testimony the City cited as mitigating any prejudice from its discovery failure, Plaintiffs explain:

> [T]he City Defendants' position that SETSS 'could be used' for [Activities of Daily Living] skills presupposes the existence of case files, student records, or data reflecting that SETTS has, in fact, been used for that purpose.  If such records exist, they were squarely responsive to Plaintiffs' discovery requests and should have been produced.  The City Defendants' failure to produce them, while simultaneously relying on a witness's speculation that such use "may have" occurred …, is precisely the type of discovery gamesmanship the adverse inference

---

[15] The City argues that the sufficiency of its Admissions is demonstrated by Plaintiffs' counsel capitalizing on them in other cases; namely, by alleging them as proof of the same systemic deficiencies asserted here.  (City Opp. at 17-18.)  The Admissions do establish propositions helpful to Plaintiffs, such as that "DOE policy does not provide for DOE IEP teams to recommend 1:1 Instruction on IEPs to students except in connection with Home/Hospital Instruction," and "DOE policy does not provide for DOE IEP teams to recommend ABA on IEPs."  (Dkt. 435 at 2 ¶¶ 18, 21.)  But those Admissions do not reach nearly the scope of what Plaintiffs' proposed adverse inferences encompass, and, even where the Admissions are similar, the City's Admissions are not identical to the adverse inferences proposed by Plaintiffs.

[16] "SETSS" stands for Special Education Teacher Support Services.

> doctrine is designed to address.  The City Defendants cannot withhold the documentary evidence that would confirm or refute their own witness's speculation and then argue that Plaintiffs lack proof."

(*Id.* at 33.)

As another illustrative example, Plaintiffs' proposed adverse inference No. 38 asserts that under the City's policies, practices, and procedures, IEP teams are not permitted to recommend "related services" for a child recommended for a non-public-school ("NPS") program that are not otherwise offered by that program.  (Pl. Reply App. at 67-69.)  Explaining why the City's referenced documents and deposition testimony do not diminish the prejudice to Plaintiffs from non-production of other materials, Plaintiffs reason:

> If IEP teams are permitted to recommend related services unavailable at an NPS program, the proof would appear in the very records Plaintiffs requested: IEPs, placement records, acceptance letters with requested modifications, related-service implementation records, RSA records, contract-agency records, CBST files, and student-level data. City Defendants failed to produce those records.

(*Id.* at 69.)  In sum, Plaintiffs have established both relevance and prejudice, along with the other elements required for an adverse inference sanction.

### 2.    Plaintiffs' Proposed Adverse Inferences Go Too Far

Even though Plaintiffs have established the elements necessary to support an adverse inference sanction, the adverse inferences that Plaintiffs seek go beyond what is justified under these circumstances.  Indeed, Plaintiffs' 60 proposed "inferences" are presented as assertions of fact, the "most harsh" type of adverse inference.  *Pension Committee of University of Montreal*, 685 F. Supp.2d at 470.  They include, for instance: "As a matter of Policy, Practice, and Procedure, the City Defendants do not assess or

evaluate Children with Autism to ascertain whether they need ABA Services" (Dkt. 574 at 8 ¶ 2); "Under the City Defendants' Policies, Procedures and Practices, IEP teams are not allowed to recommend Itinerant Teachers on IEPs for school-age children" (*id.* at 9 ¶ 11); "The City Defendants lack sufficient financial, staffing and physical resources to provide Autism Services to all Autism Service Class Due Process Subclass Members who are entitled to such services pursuant to Due Process Documents" (*id.* at 13 ¶ 35); "The City Defendants have no mechanism for tracking, monitoring, or overseeing Related Services implementation at NPS Programs attended by Class Members" (*id.* at 15 ¶ 47). Plaintiffs do not merely seek a permissive instruction that the jury ***may*** make a particular inference, but rather would have this Court draw the inference and announce the proposition as fact.  In essence, Plaintiffs ask this Court to conclude that particular facts are not genuinely disputed.[17]   Plaintiffs' requested inferences exceed what is justified under the circumstances.  Lesser sanctions are warranted.

---

[17] Plaintiffs' proposed order is ambiguous about what it seeks to do.  At the outset, the order asserts that the "following sanctions are appropriate."  (Dkt. 574 at 2.)  That statement is immediately followed by a paragraph that reads:  "An adverse inference instruction to the trier-of-fact should be provided, as follows: You are instructed that the City Defendants failed to produce relevant documents and/or provide relevant testimony. You are further instructed that as a result of the City Defendants' failure to comply with their discovery obligations, you are to assume that the evidence contained in such documents and/or testimony is unfavorable to the City Defendants."  (*Id.* ¶ 1.)  The order then follows with 40 paragraphs of defined terms.  (*Id.* at 2-8.)  After the definitions is a numbered list of 60 substantive adverse inferences, organized by class.  (*Id.* at 8-17.)

The order is not clear whether Plaintiffs propose (i) that the trier-of-fact be instructed that for each of the 60 proposed adverse inferences, they are to assume that documents and testimony not produced are unfavorable to the City with respect to each separate substantive inference, or (ii) whether, instead, that the trier-of-fact be instructed both that the City did not produce evidence and must assume such evidence is unfavorable, and additionally must accept as true each of the 60 adverse inferences.

Plaintiffs' briefing suggests the latter; i.e., accepting each of the 60 adverse inferences as

"[A]ppropriate sanctions should be tailored according to 'the prejudice suffered by the party seeking sanctions,' … and 'the severity of the sanctions imposed should be congruent with the destroyer's degree of culpability.'"  *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co., Ltd.*, 769 F. Supp.2d 269, 290 (S.D.N.Y. 2011) (quoting *Richard Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284, 292, 288 (S.D.N.Y. 2009)). In determining a sanction that is "congruent" with the offense and "tailored" to the prejudice, it is helpful to separate the adverse inferences sought by Plaintiffs into groups. They can, for the most part, be grouped into three fact categories:  (i) the "No Written Policy Group," which as discussed above, is comprised of statements that the City has "no written policies, procedures, guidance, or other similar operational documents" about a particular subject matter (Nos. 1, 3-8, 52); (ii) the "Under City Policy Group," comprised of statements that under the City's policies, procedures or practices, the City "does not"

---

fact while leaving for later a legal determination of the consequences of those facts.  With respect to their very first proposed adverse inference, Plaintiffs thus urge the Court "to **enter a finding** that the City Defendants do not have any written policies …."  (Pl. Mem. at 16 (emphasis added).)  In their supplemental reply brief, Plaintiffs state that they "have not asked the Court to rule on liability at this stage and have merely asked the Court **to make factual finding** to address the holes in discovery," while "leaving the Court to draw its own conclusions at the appropriate stage of proceedings."  (Pl. Reply at 12-13 (emphasis added).)  Similarly, in their Reply Appendix, Plaintiffs assert that they "are not yet seeking summary judgment or requesting that the Court issue a ruling declaring the conduct as described in [the respective inference] to violate the law.  Rather, Plaintiffs are requesting a **factual inference** …."  (Pl. Reply App. at 7) (emphasis in original); *see, e.g.*, *id.* at 20-21 (stating that Plaintiffs are not asking for a "legal determination" but rather are asking for a factual inference).)  In other instances, however, Plaintiffs' briefing uses language of permission, suggesting that they are seeking something less than a factual finding.  (*See, e.g.*, *id.* at 29 ("An adverse inference does not resolve a dispositive issue; it permits the finder of fact to draw a reasonable conclusion from a party's failure to produce evidence within its control.  That is precisely what Plaintiffs seek").)  Regardless, the Court's analysis of the appropriate sanction would be the same because the analysis turns not on what Plaintiffs propose, but on the facts of record relevant to determining the appropriate sanction.

or "cannot" recommend or provide a certain service (Nos. 2, 10-11, 14-28, 30-33, 36-39, 41, 43, 51, 53, 57);[18] and (iii) the "Non-Policy Assertion Group," comprised of statements that the City "does," "offers," "does not have," "does not do," or "does not require," something or "lacks sufficient" funds or resources for particular services (Nos. 9, 12-13, 29, 34-35, 40, 44-49, 54-56, 58-60).[19]

No adverse inference of any kind is warranted for the "No Written Policy Group." As recounted above, these inferences are grounded in the non-existence of documents, not documents that exist but were not produced.  Plaintiffs have not established the predicate elements to imposing sanctions.  After all, it is impossible to produce that which does not exist.  Moreover, the City has produced standard operating procedure and guidance documents that it contends are contrary to Plaintiffs' proposed "no written policy" inferences.  (*See* City Opp. App. at ECF 1-7, 30-31.)  Plaintiffs vehemently disagree that those documents support the City's position.  But that does not mean the City has engaged in sanctionable non-production of policy documents.  Further, with respect to the No Written Policy Group of proposed inferences, Plaintiffs are in the same position they

---

[18] Proposed inferences No. 37 and 57 are a bit different than the others in the "Under City Policy Group" as well as the No Policy Group.  No. 37 states "The City Defendants do not have Policies, Procedures or Practices in place to ensure that the Related Services recommended on IEPs of children attending NPS Programs are timely and fully implemented"; No. 57 is phrased similarly but concerns timely implementation of pendency.  (Dkt. 574 ¶¶ 37, 57.)  Unlike the No Policy Group, which is limited to the absence of written policies and the like, Nos. 37 and 57 may encompass non-written policies, if any.  And, unlike the Under City Policy Group, No. 37 contemplates the absence of any policy, procedure, or practice.  Although not exactly the same as the proposed formulation, these two proposed inferences can be restated as "City Policies, Procedures, and Practices do not ensure …."  The Court thus considers Nos. 37 and 57 within the "Under City Policy Group."

[19] There are two proposed inferences not included in the three categories described above:  Nos. 42 and 50.  The Court addresses those individually below.

would be even if there were relevant policy documents that the City did not produce. Either way, other than what the City already has produced, there are no written policies on those topics. And, the parties already are precluded from introducing into evidence documents they did not already produce. (*See* Hearing Transcript at 40 (Court stating "Preclusion is certainly one remedy that will apply across the board. It applies to everybody. If you didn't produce documents that you had the ability to produce, you're not going to be able to admit them later").)

Unlike the No Written Policy Group of inferences, which assert the absence of written policies, the Under City Policy Group of inferences affirmatively assert that the City has particular policies, procedures, and practices in place. Most of those inferences are phrased to establish a negative proposition that, as a matter of policy, practice, and procedure, the City does not permit or provide a particular service, or only does so under certain limited circumstances or through litigation. For example, such inferences include: "Under the City Defendants' Policies, Procedures, and Practices, IEP teams are not permitted to recommend a specific amount of 1:1 instructional time or ABA on the IEPs of children recommended for or enrolled in AIMS (formerly ABA-VB programs)" (Dkt. 574 ¶ 30); "Under the City Defendants' Policies, Practices and Procedures, IEP teams are not permitted to recommend Related Services for a child recommended for an NPS Program that are not offered by the NPS Program" (*id*. ¶ 38); and, "If a child attends an NPS Program, under the City Defendants' Policies, Procedures and Practices, the City Defendants are not permitted to offer services through a contracted agency of issue a Related Service Authorization [("RSA")] to the parent to locate a private provider, without approval by State Defendants" (*id.* ¶ 43).

Plaintiffs argue that these inferences are necessary because the City did not produce student records, program records, service lists, updated data, and the like that would have shown whether children ever received the particular service that Plaintiffs contend are not permitted or are provided under only limited circumstances such as litigation.  (*See, e.g.*, Pl. Mem. at 73-74 ("The missing records would have shown, for each child and each school, whether ABA, after-school services, and ESY/extended-day services were ever recommended on IEPs absent Litigation"); 100-101 ("If the City Defendants had actually monitored implementation of related services and vacancies at NPS Programs, they would have had documentation of those efforts"); 112 ("Through these records Plaintiffs sought to probe whether NPS students could receive services through contract agencies or RSAs absent State approval").)  Without these inferences, Plaintiffs argue, they will be hamstrung in meeting their burden to demonstrate that there is a policy, procedure, or practice to not do something.

The Court agrees with Plaintiffs to a limited extent, insofar as establishing that the City has a ***practice*** of not recommending or providing a particular service or not engaging in some activity such as monitoring, or the like.  Plaintiffs have, through the City's partial production and Plaintiffs' own production, a limited set of data and records.  Plaintiffs can prosecute their case based on that information and argue, for instance, that none of the student data or records produced in the case include an instance where X service was recommended on an IEP; where the City monitored Y; where an NPS student received services through Z provider without State approval; where a student was able to obtain ABA without litigation; where the City assessed or evaluated a student for autism; or where teachers received training for a particular service or skill.  In many instances,

34

Plaintiffs also have obtained 30(b)(6) deposition testimony that Plaintiffs characterize as supporting or confirming or even dispositive of the asserted proposition.  (*See, e.g.*, Pl. Reply App. at 28, 33, 34, 37, 38. 47, 51, 55, 58.)  Even in their initial briefing, Plaintiffs cited key admissions from the City's deponents, such as testimony admitting that, on IEPs, the City does not recommend ABA, after-school or extended day services, or home-based services.[20]  (Dkt. 512 at 8; *see also* Pl. Reply at 61 (referring to the City's 30(b)(6) testimony that the City "has no ABA providers, that parents must find their own providers for after-school ABA, that ABA is not on the DOE's continuum, that there is no RSA for ABA, and that the DOE does not contract with ABA vendors").)

Nonetheless, the City's failure to produce additional data and records potentially renders Plaintiffs vulnerable to an argument that Plaintiffs cannot establish a City practice because the Plaintiffs have incomplete information from which to draw that conclusion, and that there may be counterfactual information in the non-produced data and records. The appropriate remedy for that is three-fold.

First, as already is the case, the City will be precluded from introducing any evidence not already produced.

---

[20] Plaintiffs argue that they are prejudiced notwithstanding the City's testimony because the City may attempt to refute the 30(b)(6) deposition testimony of its own witnesses. (Hearing Transcript at 19.)  Doing so may raise a credibility issue, but the City will not be able to refute any testimony based on evidence that it has not produced.  Plaintiffs also state that, in certain instances, the witnesses gave qualified or imprecise testimony creating "holes that a truck could drive through."  (*Id.*)  That may be, but that is why the Court qualifies the language above regarding supporting testimony with "in many instances," and does not say in all instances.  Moreover, as explained above, no sanctions are warranted in connection with the City's 30(b)(6) deposition testimony.

Second, the City will be precluded from making any argument based on the absence of a complete data and record set.

Third, Plaintiffs are entitled to a non-rebuttable presumption that the non-produced data and records would be helpful to Plaintiffs and unhelpful to the City in the same way and to the same extent that the data and records the City did produce were helpful to Plaintiffs and unhelpful to the City. It remains Plaintiffs' burden, however, to show that the data and records that the City did produce were helpful to Plaintiffs and unhelpful to the City. *See Hawley v. Mphasis Corp.*, 302 F.R.D. 37, 55 (S.D.N.Y. 2014) (finding that the records produced by Defendant supported Plaintiff's argument, and that "it would stand to reason that any other records [Defendant] produced would similarly reflect" that argument); *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 437 (S.D.N.Y. 2004) (granting adverse inference where "the content of e-mails recovered from other sources … is sufficiently favorable to [Plaintiff] that [the Court is] convinced that the contents of the lost tapes would have been similarly, if not more, favorable"); *Chevron Corp.*, 296 F.R.D. at 223 (because defendants' "failure to produce may very seriously prejudice [plaintiff's] ability to prove various of its allegations … the Court in its discretion may infer from defendants' failure to produce documents … that the evidence defendants refused to provide … would have been unfavorable to them").

The Under City Policy Group of inferences includes not just an assertion of the City's practices, but also their policies and procedures. Plaintiffs can argue that the City's practices evidence or equate to an affirmative policy and/or procedure of not providing, recommending, or doing something. But no instruction or adverse inference is warranted in that regard. Nor is an adverse inference warranted on the basis that the City has not

36

produced written policies or procedures that the City does or does not do something. Even though the City cannot certify what is has or has not produced, there is no basis to conclude that the City has failed to produce written policy or procedure documents. Plaintiffs have had a full and fair opportunity to question the City about its policies and procedures, including to what extent it has written policies and procedures. The City has produced its SOPM, and the parties are free to argue what policies or procedures are reflected by that document. The notion that the City has not produced written policies or procedures prohibiting or limiting a particular service is purely speculative.

The Non-Policy Assertion Group of inferences are subject to the same analysis as the practice portion of the Under Policy Group inferences. Statements that the City "does," "offers," "does not have," "does not do," or "does not require" something implicate the City's practices. Consequently, Plaintiffs are subject to the same vulnerability and entitled to the same remedy as the Under City Policy Group: (i) the City will be precluded from introducing any evidence not already produced; (ii) the City will be precluded from making any argument based on the absence of a complete data and record set; (iii) Plaintiffs are entitled to a non-rebuttable presumption that the non-produced data and records would be helpful to Plaintiffs and unhelpful to the City in the same way and to the same extent that the data and records the City did produce were helpful to Plaintiffs and unhelpful to the City. It remains Plaintiffs' burden, however, to show that the data and records that the City did produce were helpful to Plaintiffs and unhelpful to the City.[21]

_____

[21] As with the Under City Policy Group inferences, Plaintiffs routinely cite evidence in the record supporting their assertions that belies the absence of proof to demonstrate a negative proposition. As just one example, inferences Nos. 12, 34, and 35 concern funding for services. The inferences assert, essentially, that the City has only one specific source of funds for ABA and that the City lacks sufficient financial, staffing, and physical

These measures are the least harsh sanction that sufficiently remediates any prejudice to Plaintiffs and provides appropriate deterrence.

As noted above, there are two proposed inferences the Court did not include in the three groups. The Court addresses them here. No. 42 is not in dispute. (*See* Dkt. 574 at 14 ¶ 42 (adverse inference stating that "[i]f a child attends a public or charter school, and the school cannot implement Related Services on a child's IEP, the City Defendants may provide services through another funding source, arrange for a contracted agency to provide services or issue a Related Service Authorization to the parent to locate a private provider").) That assertion shall be added to the City's admissions.

No. 50 is geared towards establishing sufficient subclass size for the as-yet uncertified Rule 504 Subclasses. (*See id.* at 15 ¶ 50 ("From May 30, 2010, through the present time, there were at least 40 Autism Service Class Members who are Section 504 Eligible").) In this instance, a presumption that non-produced documents are the same

---

resources to provide autism services, including ABA. (Dkt. 574 at 9, 13 ¶¶ 12, 34-35.) Plaintiffs argue, inter alia, that they are entitled to the inferences they seek because the City has not identified "any specific document, data set, staffing record, provider list, allocation memorandum, service code, or program-capacity record showing that these services are available to Autism Service Class Members outside litigation." (Pl. Reply at 61.) But at the same time, Plaintiffs assert that the City's "own witnesses and documents have shown the opposite in several respects." (*Id.*) For instance, "the only produced funding document that specifically referenced ABA was the School Allocation Memorandum funding AIMS, and AIMS provides indirect BCBA support to staff, not direct ABA services to students." (*Id.* at 63.) Otherwise, the City broadly references general funding sources (such as tax levies) without any connection to ABA services. (*Id.* at 63-64.) Plaintiffs thus have evidence to prove their points and advance arguments based on affirmative evidence, as well as the absence of evidence. The same is true for NPS Class related inferences Nos. 46-49. (*See, e.g., id.* at 80 ("The record confirms" that NPS Programs are not required to report on related-service attendance); 82 ("The testimony of City Defendants' own witnesses support the inference"); 84 ("That narrowed inference is fully supported by Mr. Powers' testimony"); 86 (referring to City 30(b)(6) deponents Lu-Berio and Powers, "[t]heir testimony supports Plaintiffs").)

as the produced documents with respect to the City's practices does not address the prejudice to Plaintiffs. If the City's partial production of student records does not include 40 such students, a presumption that non-produced records would show the same works *against* Plaintiffs.

It also would appear to be at odds with the City's published statistical data. Plaintiffs seek to establish a numerical minimum of students who are Section 504 eligible. To be eligible, an individual must have a qualifying disability, which the statute defines as "a physical or mental impairment that substantially limits at least one or more major life activities." 42 U.S.C. § 12102(1)(A); *B.C. v. Mount Vernon School District*, 837 F.3d 152, 159 (2d Cir. 2016) ("Section 504 expressly incorporates, with certain qualifications … the ADA's definition [of disability]") (citing 29 U.S.C. § 705(20)(B)). ADA regulations identify autism as an impairment which "substantially limits brain function" from which it can "easily be concluded that the … impairment[] will, at a minimum, substantially limit … major life activities." *See* 29 C.F.R. §§ 1630.2((j)(3)(iii); *Glaser v. Gap Inc.*, 994 F. Supp.2d 569, 575 (S.D.N.Y. 2014) ("According to the regulations … the conclusion should easily be drawn that certain enumerated impairments will, at a minimum, substantially limit the major life activities indicated. Among the impairments listed in the regulations is autism, which the regulations specifically state substantially limits brain function") (internal quotation marks and citations omitted).

According to the City's data reporting, more than 33,000 school-age children were classified with autism during the 2023-2024 year.[22] Those statistics alone would appear

---

[22] *See Annual Special Education Data Report – School Year 2023-2024*, N.Y.C. DEP'T OF EDUC., https://infohub.nyced.org/docs/default-source/default-document-library/annual-special-education-data-report-school-year-2023-2024.xlsx (last visited June 11, 2026).

to support the "at least 40" assertion.  The City, however, has not produced all student records, thus depriving Plaintiffs of evidence that likely would support the proposition. The least harsh remedy for the City's discovery transgression with respect to this issue is an adverse inference that there are at least 40 students within the Autism Services Class that are Section 504 eligible.  Accordingly, the Court finds that the least harsh sanction with respect to the issue of Section 504 eligibility is granting an adverse inference that, from May 30, 2010, through the present, there were at least 40 members of the Autism Services Class who are Section 504 eligible.[23]

## Conclusion

For the foregoing reasons, Plaintiffs' motion for adverse inferences is GRANTED IN PART and DENIED IN PART as follows:

1.    Plaintiffs' motion is DENIED with respect to proposed adverse inferences Nos. 1, 3-8, and 52.

---

The reported number of students with autism was considerably lower in years past, but still of substantial magnitude.  For instance, for the 2017-2018 school year, the City reported 18,341 students with autism.  *See Annual Special Education Data Report – School Year 2017-2018*, N.Y.C. DEP'T OF EDUC. 32 (Nov. 1, 2018), https://infohub.nyced.org/docs/default-source/default-document-library/annual-special-education-data-report-sy-17-18.docx.

[23] The City's only response regarding the "at least 40" issue is that it "is a fact issue which is improperly the subject of an adverse inference," and that the fact is irrelevant because no Section 504 class or subclass has been certified in this case. (City Opp. App. at ECF 29 ¶ 50.) Neither assertion passes muster.  First, adverse inferences are given to address the problem presented, as here, where an adversary fails to produce discovery.  Second, Plaintiffs have specifically alleged Section 504 subclasses in their post-certification Fifth Amended Complaint.  (*See* FAC ¶¶ 470, 489; *see also id.* ¶¶ 517-530 (Defendants' alleged violations of Section 504).)   That the Court has not yet been asked to determine whether Section 504 subclasses should be certified does not mean that the issue is irrelevant.

40

2.      With respect to proposed adverse inferences Nos. 2, 9-49, 51, 53, 57-60, Plaintiffs are GRANTED the following relief:  (i) the City will be precluded from introducing any evidence not already produced; (ii) the City will be precluded from making any argument based on the absence of a complete data and record set; (iii) Plaintiffs are entitled to a non-rebuttable presumption that the non-produced data and records would be helpful to Plaintiffs and unhelpful to the City in the same way and to the same extent that the data and records the City did produce were helpful to Plaintiffs and unhelpful to the City.  It remains Plaintiffs' burden, however, to show that the data and records that the City did produce were helpful to Plaintiffs and unhelpful to the City.

3.      Proposed adverse inference No. 42 shall be deemed an admission by the City.

4.      With respect to proposed adverse inference No. 50, Plaintiffs are granted an adverse inference that from May 30, 2010, through the present, there were at least 40 members of the Autism Services Class who are Section 504 eligible.

To the extent not discussed above, the Court has considered the parties' arguments and found them to be either moot or without merit.

The Clerk of Court is respectfully directed to terminate the motion at Dkt. 507.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: June 30, 2026
        New York, New York

Copies transmitted this date to all counsel of record.

41